IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No.: 4:20-CV-14-FL

| | | |
|---|---|---|
| ANTHONY HICKS, | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW** |
| vs. | ) | **IN SUPPORT OF DEFENDANTS'** |
| | ) | **MOTION IN LIMINE TO EXCLUDE** |
| CITY OF KINSTON, NORTH CAROLINA; | ) | **TESTIMONY OF WILLIAM DAVID MUNDAY** |
| BRANDON WELLS; MATTHEW AKIN; | ) | |
| TYLER WILLIAMS; DARRION MARTIN; | ) | |
| Defendants, | ) | |

NOW COME Defendants, City of Kinston, North Carolina, Brandon Wells, Matthew Akin, Tyler Williams, and Darrion Martin, by and through the undersigned Counsel, and submit this Memorandum of Law to the Court in support of their Motion in Limine filed contemporaneously herewith, pursuant to Rules 401, 403 and 702 of the Federal Rules of Evidence, to preclude William David Munday ("Munday") from providing speculative, misleading, unfairly prejudicial, or otherwise improper expert testimony in this matter. Defendants respectfully request that this Court preclude the subject testimony both at the summary judgment stage and at the trial of this matter. In support of this motion, Defendants show the Court the following:

## I.    Introduction

Police officers with the Kinston Police Department conducting a sweep of a condemned structure with no electrical power that was supposed to be unoccupied, abruptly encountered Plaintiff in a dark room in the rear of the building, and when, within a few seconds of the encounter two of the officers perceived that Plaintiff had thrust a gun towards the officers and pointed it directly at the lead officer's face, defended themselves and their fellow officers from what they believed to a deadly threat by firing their service weapons towards Plaintiff. As a result of an injury sustained by Plaintiff in the encounter, Plaintiff asserts claims against Defendants pursuant

to 42 U.S.C. §1983 for excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution, as well as state law claims of negligence, gross negligence, assault and battery, and also requests punitive damages.

Based on the foregoing facts, the claims advanced by Plaintiff, and the defenses asserted by Defendants in the case, Defendants maintain that the two primary issues that are present in the context of this case are (1) the reasonableness of officers' entry into the structure, and (2) the reasonableness of officers' subsequent use of force. Any expert opinion testimony, therefore, should assist the trier of fact in resolving facts that pertain to the aforementioned issues, as explained below.

## II.    **The Permissible Scope of Expert Testimony**

The point of expert testimony is to help jurors understand complicated, complex or nuanced information using the expert's specialized knowledge and/or experience to do so. This is made plain by Federal Rule of Evidence 702, which incorporates *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and the cases applying *Daubert*, such as *Kumho Tire Co. v. Carmichael*, 525 U.S. 137 (1999). Fed R. Evid. 702 (Advisory Note, 2000 amends.). Rule 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The

trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. See Fed. R. Evid. 702, advisory committee's note (2000 amends.). "[T]he law grants a district court the same broad latitude when it decides how to determine reliability [of expert testimony] as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141-42.

In regards to the burden of proof, "[t]he proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). And expert testimony, like any other evidence, must be relevant under Rule 402 of the Federal Rules of Evidence. As the Supreme Court noted in *Daubert*, "Rule 402 provides the baseline . . . . Evidence which is not relevant is not admissible." 509 U.S. at 587. And, even if relevant, its probative value must outweigh its unduly prejudicial effect. *Id*. at 596. Based upon these general principles, the federal courts have applied a number of tests for determining the permissible scope of expert testimony. Without attempting to catalogue all of these tests, the primary tests used in the Fourth Circuit to determine the permissible scope of expert testimony have resulted in the following sensible rules:

1. Expert testimony that concerns matters within the common knowledge and experience of a lay juror is not admissible. *United States v. Dorsey*, 45 F.3d 809 (4th Cir. 1995);

2. Expert testimony regarding the credibility of a witness or her testimony is not admissible. *United States v. Lespier*, 725 F.3d 437 (4th Cir. 2013);

3. Expert testimony which is based upon assumptions that are speculative is not admissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir. 1994); and

4. Expert testimony that constitutes a legal conclusion is not admissible. *United States v. Offill*, 666 F.3d 168 (4th Cir. 2011).

In addition to being unqualified to offer an opinion on the facts at issue in this case, Munday's proposed testimony violates each and every one of the foregoing rules.

**III.** **Munday not Qualified to provide Expert Opinion Regarding Issues in Case**

Munday holds himself out as a "Police Policy and Procedure Expert," and has offered his services in such capacity only for plaintiffs.[1]   When asked whether he holds himself out as being an expert witness on anything other than police policies and procedures, Munday responded "No, sir.  Police policies and procedures is my bailiwick."[2]

A review of Munday's resume and deposition testimony further reveals the narrow scope of his expertise.  Aside from working as a dispatcher only for Granite Falls Police Department and the Lenoir Police Department, Munday's sworn law enforcement career began on July 25th, 1979, where he worked for approximately two years as a deputy with the Caldwell County Sheriff's Department.[3]  Aside from his brief tenure with the Caldwell County Sheriff's office over 40 years ago, Munday's entire law enforcement career since August 1981 has been with the North Carolina State Highway Patrol.[4]   The duties of the State Highway Patrol, as stated by statute in G.S. 20-188 and acknowledged by Munday, focus primarily on enforcement of traffic regulations and laws with respect to travel and use of vehicles on the highways of the State.[5]  The Highway Patrol is a state law enforcement agency, as opposed to local law enforcement agencies such as a police department or sheriff's department.[6]   Munday was a patrol trooper—working primarily in the field—for nine years.[7]  In 1991, Munday was promoted to line Sergeant, where his work consisted of "75 percent patrol in the field and 25 percent administrative."[8]  That field work consisted of

---

[1] Ex. A - Report of William David Munday, p. 10.
[2] Ex. B – Deposition of William David Munday, 52:14-18.
[3] *Id* at 10-14: 23-20.
[4] Ex. A at pg. 2.
[5] *Id* at 17:16-18:17.
[6] *Id* at 18:10-13.
[7] *Id* at 25:18.
[8] *Id* at 25:9-12; 24:2-25:1.

active patrol, but " more so making sure the troopers had what they needed, serving as backup, monitoring their activities, things of that nature.[9]    The 25% administrative component consisted of "working in the office doing reports, performance appraisals, things of that nature."[10]   Two years later, in 1993, Munday was promoted to District First Sergeant, where his duties where 90 percent administrative and 10 percent field work.[11]  As Munday moved upwards through the ranks, he took on a more administrative role.[12]  In the role of Captain, a role he was promoted to in 1999,[13] Munday worked in the following capacity:

> "[C]aptain of the communications and logistics section in Raleigh. That was a headquarters position and basically what that was was more of a purchasing contracts, State contracts. I purchased all of the vehicles, all of the uniforms all of the equipment went through my office. It was a hundred percent administrative of course."[14]

Finally, in the role of Major, a promotion he received in 2002 until his retirement from the Highway Patrol in 2007, he served over Professional Standards, Field Operations, Special Operations, and Federal Motor Carrier Enforcement.[15]   His position as Major was a hundred percent administrative.[16]   Though Munday had oversight of the Use of Force and Pursuit Committees while Major over Professional Standards, it was unclear how much direct involvement he had in such reviews, which were handled by the Committees themselves, and for how long he served in that capacity, considering he also served in several different assignments as Major,

---

[9] *Id* at 24-25:17-1.
[10] *Id*.
[11] *Id* at 20:5-10; 25:22-25.
[12] *Id* at 28:1-13.
[13] Ex. A at p. 2
[14] Ex. B at 27:7-14.
[15] Ex. A at p. 2.
[16] *Id* at 28:19-20.

including Field Operations, Special Operations, and Federal Motor Carrier Enforcement.[17] During

his Special Operations assignment as Major, Munday's assignments included:

> "[G]overnor's security detail, the helicopters, accident reconstruction teams, any
> executive's security assignments, which we did a great deal of on the highway patrol
> with presidential motorcades, any time an executive of any type any point through
> the national system would come into the State we would have to provide security
> for them. Different events that occurred in the State such as the Lowe's Motor
> Speedway, the governor's conferences, things of that nature I would have to take
> care and manage those operations."[18]

Such expertise clearly does not apply to the issues at hand in this case.

In 2003, Munday formed a company called BlueLine Advantage, where he has worked

since as a consultant assisting law enforcement agencies across the county with CALEA

accreditation and policy preparation.[19] CALEA stands for Commission on Accreditation for Law

Enforcement Agencies Incorporated, and is the only accrediting body in the U.S. that deals with

law enforcement accreditation.[20] Munday also served as a CALEA assessor, where he would do

site reviews to ensure that law enforcement agency policies and practices were compliant with the

CALEA standards.[21] The accreditation process revolves around having appropriate policies and

practices in place, as well as proof of compliance with such policies and procedures; which

essentially consists of spot-checking for compliance.[22] As a consultant with BlueLine Advantage,

Munday would travel on-site to police departments to make sure their policies and practices were

ready for an assessor to come in and review compliance with CALEA standards.[23]

---

[17] Ex. A at p. 2.
[18] Ex. B at 22:14-24.
[19] *Id* at 34:1-12.
[20] *Id* at 34:1-13.
[21] *Id* at 35:11-15.
[22] *Id* at 43:10-25; 46:3-7
[23] *Id* at 37:12-17.

Plaintiff has the burden in this case of proving that Munday is qualified to render an opinion on the issues at hand. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) ("The proponent of the testimony must establish its admissibility by a preponderance of proof."). Rule 702 requires that Munday's proposed testimony be reliable. Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable. *Gell v. Town of Aulander*, No. 2:05-CV-21-FL, 2008 U.S. Dist. LEXIS 107245, at *5 (E.D.N.C. Dec. 1, 2008); *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005); *Boss v. Nissan N. Am.*, 228 Fed. Appx. 331, 337, 2007 WL 1482013 (4th Cir. 2007) ("Expert testimony must be both reliable and relevant."). Reliability of a proposed expert's testimony encompasses both the expert's qualifications and the reasoning, methodology, or technique underlying the formation of the expert's opinion. *See Tunnell v. Ford Motor Co.*, 330 F.Supp.2d 707, 714-15 (W.D. Va. 2004); *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1268 (D. Kan. 2003) ("Reliability analysis applies to all aspects of the expert's testimony, including the facts underlying the opinion, the methodology and the link between the facts and the conclusion drawn."). With those principles in mind, just because a person is an expert in one area does not necessarily qualify them to testify as an expert on matters falling outside their area of expertise. *See Gell v. Town of Aulander*, No. 2:05-CV-21-FL, 2008 U.S. Dist. LEXIS 107245, at *11-12 (E.D.N.C. Dec. 1, 2008) (holding that while [the proposed expert's] extensive legal background may well qualify him to testify as an expert on certain matters, it does not qualify him to testify as an expert on the matters which are the subject of his proposed testimony in this case.) (*citing Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.*, 748 F.Supp. 373, 386 (E.D.N.C. 1990) (testimony of an expert which is outside his area of expertise is excludable under Rule 702).

An expert providing an opinion cannot simply put forth his or her conclusion, but must "explain how [his or her] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). "Time and credentials in a field alone do not create a sufficient basis for testimony; an expert must provide specific explanation of his or her methods and reasoning to insure his or her conclusions rest upon a reliable basis." *Spears v. Cooper*, No. 1:07-CV-58, 2008 U.S. Dist. LEXIS 107048, at *10 (E.D. Tenn. Nov. 17, 2008). In assessing an expert's qualifications, it is crucial that the "expert's background . . . show qualification sufficient to permit expression of an opinion that is borne of the specialized knowledge or expertise which allows the expert to give opinion evidence in the first instance." *Anderson v. Nat'l R.R. Passenger Corp.*, 866 F. Supp. 937, 943 (E.D. Va. 1994).

As stated above, Munday holds himself out as a "Police Policy and Procedure" expert. In his deposition, Munday stated that he reviewed the City of Kinston's "current existing policies at the time," including the Police Department's Use of Force Policy, and that based on his review, the City's policies "were well written, they followed all of the constitutional requirements, all of the North Carolina Sate requirements, and as a matter of fact, most of the accreditation standards were covered."[24] Aside from the foregoing, at no other point does Munday offer an opinion in the case that draws on his experience as a "police policies and procedures expert." In his report, after restating the City of Kinston's use of force policy requirements, Munday concludes that "no officer in the same position of Sergeant Wells, or the other officers involved in this shooting, could reasonably believe to be in imminent threat of death or serious physical injury."[25] Munday does

---

[24] Ex. B. at 6:8-12; 56:11-22.
[25] Ex A. at p. 16.

not draw on his own experience for said conclusion, but instead arrives at this conclusion by discrediting the officers accounts. For example, Munday's own report has the following statements:

- "According to Sgt. Wells, Anthony Hicks failed to show his left hand and that he saw an object appearing to what he believed to be a handgun in his left hand."[26]

- "Sergeant Wells stated he observed a gun in Anthony Hicks' left hand that he was in fear of his life at that point"[27]

- "He [Sgt. Wells] stated he was anticipating being shot in the back by Anthony Hicks."[28]

Munday's opinion that the officers could not reasonably believe to be in imminent threat of death or serious physical injury" is based, as he states in his report, on his "review of the body camera footage [which] indicates that Anthony Hicks never made any threatening statements or gestures towards Sergeant Wells or the other officers."[29] He reached such a conclusion despite acknowledging that a body camera video would not have the same perspective as the officer wearing it [at least a "foot apart"], and that the officers actually claimed to have seen a weapon.[30] Munday discounted the officers who saw a weapon, stating "it was embellished that a weapon was there."[31] Because such opinion relies solely on testimony regarding the credibility of a witness or her testimony, it is not admissible. *United States v. Lespier*, 725 F.3d 437 (4th Cir. 2013). The

---

[26] *Id* at p. 12.
[27] *Id* at p. 16.
[28] *Id*.
[29] *Id*.
[30] Ex. B at 129-130: 16-6.
[31] *Id* at 128:6-132:12.

foregoing opinion also constitutes a legal conclusion and is not admissible on that basis as well. *United States v. Offill*, 666 F.3d 168 (4th Cir. 2011).

Aside from Munday's statement that the City's policies were "well written" and followed all applicable laws, and the foregoing improper opinion about whether the officers' "reasonably believed to be in immediate threat of death or serious physical injury" as required by City policy, Munday offers no other opinion that appears to draw on his expertise with regard to police policy and procedure. As a result, and because the issues in this case do not center around the adequacy of the City's policies and procedures[32] but rather the "reasonableness" of the officers' conduct—a province of the jury or this Court--Munday's testimony should be excluded entirely.

This is even more compelling in terms of Munday's opinions regarding the officers' entry into the home. There is nothing in Munday's background or experience that would suggest that he has the requisite specialized knowledge or expertise to offer an opinion regarding a search of a residence. Aside from a very early and short stint with a Sheriff's office over 40 years prior, Munday's entire career has been in the Highway Patrol, an agency dedicated primarily to traffic enforcement and the use of the highways of the state. He quickly advanced through the ranks of the Highway Patrol, and finished his career performing highly administrative tasks, none of which involved training or teaching about how to conduct proper searches of dwellings. In fact, Munday's expertise regarding warrantless searches seems to be confined to his own improper ideas about consent (e.g., that it requires "clear permission"), and what he was able to find on a North Carolina School of Government website.[33] In his deposition he claimed to be "somewhat" familiar with the community caretaking exception, but when asked, utterly failed to identify the exception

---

[32] As they would if, for example, a poorly written or legally erroneous policy—deviating from standard and accepted policies—was the cause of an alleged constitutional deprivation.
[33] Ex. A at pp. 15; 14.

in even the most basic terms, despite it being the primary reason that Sgt. Wells espoused for entering the structure.[34]  "While a district court's task in examining the reliability of experiential expert testimony is … somewhat more opaque [than with other expert testimony], the district court must nonetheless require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (citing Fed. R. Evid. 702 advisory committee's notes).

For the foregoing reasons, Defendants maintain that Munday's testimony is not reliable, is not based on any discernable methodology, is not based on any particular expertise or specialized knowledge, and as a result should be excluded, as the admission thereof would be unduly prejudicial to Defendants, where Munday's opinions could be afforded greater deference by a jury than it ought to be entitled to. *See Clem v. Corbeau*, 98 F. App'x 197, 201 (4th Cir. 2004) (*citing Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (Stating that "since the proffered experts did not offer expert testimony providing specialized knowledge on 'obscure skills'… and instead involved opinions, given their particular interpretations of the contested facts, as to the reasonableness of [Defendants'] use of force at issue in this case … said expert testimony risked 'supplanting a jury's independent exercise of common sense' and its role of determining the facts.") (internal citations omitted).

## IV. Munday Testimony Improperly Concerns Matters Within The Knowledge And Experience Of A Juror, Relies On His Own Witness Credibility Determinations, Is Based On Speculative Assumptions, And Includes Legal Conclusions

In addition to the foregoing blanket objection to Munday's testimony based on concerns about its reliability and potential for prejudice, Defendants maintain that Munday's testimony, as

---

[34] Ex. B at 74-76:22-7.

a whole, is nearly completely comprised of legal conclusions based on improper and speculative assumptions or credibility determinations, and invades the province of the jury (or this Court) to make routine determinations in regards to "reasonableness" or "consent."

Leaving aside Munday's synopsis of facts or other introductory content that would not be admissible for any evidentiary purpose[35], Munday's purported "expert opinions" appear to commence on page 5 of his report, under the heading *Expert's Opinions Based on Review of Facts*.[36] Nevertheless, the first paragraph following that heading on page 5 and continuing at the top of page 6 is dedicated entirely to a generic commentary on the state of "21st Century Policing in America" without any apparent connection to the facts of the present case.[37] Such a statement does not assist the trier of fact in any way, and should be excluded. Leaving aside other such similar sidebars or inadmissible recitations of fact, the following excerpts from Munday's report appear to contain his "expert opinion" in regards to this matter, grouped into two categories corresponding to the issues in the present matter--i.e., (A), entry into the condemned structure, and (B) the reasonableness of the use of force.

(A) Munday's Opinions Regarding the Officer's Entry into the Structure

---

[35] "An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on record evidence." *Newirk v. Enzor*, No. CV 2:13-1634-RMG, 2017 WL 823553, at *4 (D.S.C. March 2, 2017), quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). See also *Taylor v. Evans, 1997 WL 154010, at *2 (S.D.N.Y. Apr.1, 1997)* (rejecting portions of expert report on the ground that the testimony consisted of "a narrative of the case which a lay juror is equally capable of constructing"); *LinkCo, Inc. v. Fujitsu Ltd., 2002 WL 1585551, at *1-*2 (S.D.N.Y. July 16, 2002)* (where expert's report was based on a review of, *inter alia,* "documents, computer documents, computer files, deposition transcripts and exhibits," the "testimony by fact witnesses familiar with those documents would be far more appropriate ... and renders [the expert witness'] secondhand knowledge unnecessary for the edification of the jury") (citation and internal quotation marks omitted) (alterations in original).
[36] Ex. A, at p. 5.
[37] *Id* at pp. 5-6.

> "*Sergeant Brandon Wells went beyond the scope of his enforcement to respond to a complaint involving a disgruntled landlord.*"[38]

As an initial matter, it is improper for Munday to speculate as to the officer's apparent "intention." *See In re Fosamax Prods. Liab. Litig.*, 645 F. 2d 164, 192 (S.D.N.Y.2009) (holding that "testimony as to 'the knowledge, motivations, intent, state of mind, or purposes of' a person 'is not a proper subject for expert or even lay testimony'") (internal citations omitted). Moreover, and despite the foregoing statement, the record of the case and Munday's own report quickly establish that Sergeant Wells had multiple other legitimate purposes for visiting the property. As stated by Munday in the same paragraph "…the primary theme…" discussed at the D-shift rollcall briefing was "drug activity at the residence of 900 Tower Hill Road."[39] The report also states that:

> "[H]is supervisor, Captain S. Reavis had tasked him to pay special attention to high crime areas and coordinate proactive policing efforts in order to protect the safety of the citizens that live and work in these areas. He went on to say; some of these pro-active efforts include foot patrol, traffic checkpoints and knock-and-talks in areas of elevated crime activity."[40]

Finally, after discussing the "knock and talk doctrine," Munday concluded, "based on the review [of the record], the primary intention of Sergeant Wells and other officers from the "D" Shift was to travel to the residence, identify the occupant(s) and engage in conversation to gain probable cause to initiate a search."[41] However, as Munday admitted in his deposition, the officers could have gone to the residence and conducted a knock and announce "for no reason at all" because that is as much as an ordinary citizen could do.[42] *See Florida v. Jardines*, 569 U.S. 1, 8, 133 S. Ct. 1409, 1416 (2013) (stating that "a police officer not armed with a warrant may approach a home and knock, precisely because that is '"no more than any private citizen might

---

[38] Ex. A. at p. 5.
[39] *Id*.
[40] *Id* at p. 14.
[41] *Id*.
[42] Ex. B at 66-67:23-10.

do.'" (*citing Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 179 L. Ed. 2d 865, 881 (2011). Therefore, Munday's opinion about what brought Sgt. Wells and his fellow officers to 900 Tower Hill Road—and therefore being outside the scope of his enforcement—are both irrelevant (since he could have arrived at that location for any reason or no reason at all) and unsupported by the record evidence, and as such, should be excluded. Expert testimony, like any other evidence, must be relevant under Rule 402 of the Federal Rules of Evidence.

> *"On this occasion, it does not appear, the occupant of the home gave clear permission for Sergeant Wells to enter the home. Sergeant Wells took it upon himself, along with officers from his shift to enter the residence illegally without cause or permission."[43]*

The foregoing statement should be excluded first because it contains a legal conclusion—that Sergeant Wells entered the residence "illegally." *See United States v. Offill*, 666 F.3d 168 (4th Cir. 2011) (holding that expert testimony that constitutes a legal conclusion is not admissible). Moreover, the conclusion is based solely on Munday's view that Sergeant Wells had neither (1) cause, nor (2) permission. Munday's own report makes clear that Sergeant Wells believed he had cause to enter the premises to (i) ("search the house for any other animals"[44], and (ii) because the house had been condemned and to do a welfare check.[45] Aside from concluding that the entry was illegal, Munday does not explain in any fashion why Sergeant Wells' grounds for entering the property were legally insufficient, or were not in accordance with police policy and procedures. As such, it is merely an unsupported legal conclusion and should be excluded. *See Antekeier v. Laboratory Corp. of Am.*, No. 1:17-CV-786, 2018 WL 3028609, at *1 (E.D. Va. May 1, 2018)

---

[43] Ex. A at p. 15.
[44] *Id* at p. 4.
[45] *Id* at pp 12; 15 (see Wells' deposition excerpt).

("an expert's professional judgment, standing alone and without any supporting facts or data, is insufficient to support opinion testimony").

Even more egregious is Munday's assertion that Sergeant Wells entered the property "without…permission."[46] Munday's report establishes that the foregoing conclusion is based on Munday's belief that "Sergeant Wells embellished the truth when he stated he was given verbal permission by Anthony Jones to come inside."[47] This statement establishes two principles (1) that Sergeant Wells stated he was given verbal permission, and (2) Munday's belief that Sergeant Wells was not truthful in that statement. As Munday made clear in his deposition, the sole basis for his conclusion that Sergeant Wells' embellished the truth when he stated he was given verbal permission by Anthony Jones to come inside, was based on Munday's own review of the body camera footage of the incident.[48] It is also directly contradicted by two other officers who recalled Anthony Jones verbalizing his consent to the officers' entry.

Under similar circumstances, a court excluded proposed expert opinion testimony based on the expert's review of a Facebook Live video as "unhelpful to the jury." *See United States v. Underwood*, No. 0:19-cr-420-JMC, 2021 U.S. Dist. LEXIS 62542, at *9 (D.S.C. Mar. 31, 2021). In that case, the expert concluded, after reviewing a Facebook Live video, that the suspect "did appear to enter the roadway after being instructed by [the sheriff] to stay on his porch," and that the sheriff "did advise [the suspect] that he was under arrest prior to restraining him by stating, '[y]ou're going to jail.'" *Id*. The court excluded both statements because "jurors using common sense and their faculties of observation may interpret such events within the instant video evidence without the help of an expert." *Id*. (*citing United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir.

---

[46] *Id* at p. 15.
[47] *Id*.
[48] Ex. B at 96-97:16-10.

1995)); *McCoy v. Biomet Orthopedics, LLC*, No. CV ELH-12-1436, 2021 U.S. Dist. LEXIS 13716, 2021 WL 252556, at *12 (D. Md. Jan. 25, 2021) ("[P]roposed [expert] testimony that concerns matters within the common knowledge and experience of a lay juror does not pass muster.").

Aside from isolated and wholly unsupported characterizations and legal conclusions such as "…*during the unprofessional and illegal encounter*…" "*...upon entering illegally and without justification...*" and "…*initiated an illegal search*…" Munday does not set forth any other basis for attacking the legality of the officers' entry into the home.[49]    As a result, any opinion evidence from Munday regarding the officers' entry into the home should be excluded as improper and highly prejudicial.  Where an expert opinion is based on speculation or conjecture, it must be excluded. "[A]n expert witness' testimony must, among other things, be based on sufficient facts or data . . . ." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017); *Fernandez v. Spar Tek Indus., Inc.*, C.A., 2008 WL 2185395, at *6 (D.S.C. May 23, 2008) ("An opinion based on an inadequate . . . factual foundation cannot be a reliable opinion, no matter how . . . how well-qualified the expert"); *see also Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 144 (4th Cir. 1994) ("When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury and should be excluded by the district court."); *see also United States v. Purpera*, 844 F. App'x 614, 627 (4th Cir. 2021) (unpublished) (stating "[i]t is generally an abuse of discretion for the district court to admit 'opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts.'") (*citing United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)).

<u>(B) Munday's Opinions Regarding the Reasonableness of the Use of Force</u>

---

[49] Ex. A at p. 15.

After reciting the facts leading up to the shooting, and referring to the City of Kinston's use of force policy, which permits an officer's use of deadly force "when it is, or appears to be, reasonably necessary to protect himself/herself or others from what the officer reasonably believes to be an imminent threat of death of [sic] serious physical injury, Munday sets forth the following opinions:

> *"No officer in the same position as Sergeant Wells, or the other officers involved in this shooting, could reasonably believe to be in imminent threat of death or serious physical injury."*[50]

> *"[U]pon confronting Anthony Hicks and assuming Anthony Hicks had a gun in his hand, Sergeant Wells failed to warn Anthony Hicks to drop his gun before shooting him despite having the opportunity to do so."*[51]

> *"Sergeant Wells had the opportunity to withdraw from the confrontation with Anthony Hicks without discharging his firearm and should have done so."*
> *This expert does not believe an imminent threat of death or serious physical injury existed during the encounter between Sergeant Wells and Anthony Hicks."*[52]

> *"There was no reasonable subjective justification for the excessive and deadly force used by Sergeant Wells and the other officers against Mr. Hicks."*[53]

In his report, Munday does not base the foregoing opinions on any discernable standard regarding the nature, extent, scope, or science regarding the bounds of permissible use of force. Instead, as Munday clarifies during his deposition, the foregoing opinions are based on Munday's preferred reading of facts in which he believes that the officers "embellished that the weapon was there."[54]

He makes this statement despite full well understanding that Sgt. Wells and Officer Williams believed they saw a weapon.[55]   Munday himself even admitted that the still frame image

---

[50]  Ex. A at p. 16.
[51]  *Id*.
[52]  *Id*.
[53]  *Id* at p. 17.
[54]  Ex. B at 132:4-12.
[55]  *Id* at 133:4-9.

from Officer Williams body camera appeared to show what looks like Hicks' finger[56]—which he also later testified appeared to be "an African American male or African American finger, black, darker color, could be brown…"[57] Munday elaborates elsewhere in his deposition that "[t]hat appears to be his right hand coming out and I do see something there but it doesn't appear to be a gun to me but there is an object…"[58]

Munday also admitted to having reviewed Sgt. Wells' deposition, in which Sgt. Wells stated –after observing a weapon or gun—he turned his body and face to the left to shield his face to avoid getting shot in the face.[59]    Munday also admitted that, in his review of Sgt. Wells' deposition, while describing his frame of mind when he decided to pull the trigger, Sgt. Wells stated "several times" how he was very much in fear of his life at the time, and how Sgt. Wells made the statement that Hicks had a gun as soon as they emerged from the house and regrouped behind their police cruisers.[60]

In spite of the foregoing, Munday recites as a fact in his report that "a review of the body camera footage indicates that Anthony Hicks never made any threatening statements or gestures towards Sergeant Wells or the other officers."[61] Munday admitted that he reached the foregoing conclusion based on his own personal review of the body camera footage <u>only</u>.[62]

A review of Munday's deposition makes clear that the foregoing personal assumptions— that Anthony Hicks did not make any threatening gesture and that the officers embellished that they saw a gun—based on Munday's review of the record, are the sole basis for the foregoing

[56] *Id* at 156:5-9.
[57] *Id* at 178:17-21.
[58] *Id* at 161:4-6.
[59] *Id* at 145-146:14-3.
[60] *Id* at 175:7-9; 160:3-10.
[61] Ex. A at p. 16.
[62] Ex. B at 128:20-25.

italicized opinions offered by Munday regarding the reasonableness of the officers' conduct in the context of the use of force. For example, in his deposition, Munday makes the following statement:[63]

> **Q. I promise I won't take up much more times but just to address those very quickly. You stated that the officer who did have a target was Sergeant Wells, right?**
>
> A. Based on the information that he provided to the SBI, he has indicated that, yes, he had received a threat. He shot and he turned his head. In his statement he said he turned his face to keep from being shot in the face and fired shots. He didn't aim, he just fired shots and retreated out of the building, out of the house, which he should have. I mean, he should have gotten out as quickly as they could. If there was a threat there and it was continuing, continue to shoot. No threats there, first, they shouldn't have shot to start with if there was no threat. Secondly, if the threat keeps coming, yes, keep shooting. If not, back up, get out of the house, assess the situation and go from there.

Elsewhere in his deposition, Munday makes the following statement:[64]

> **Q. I understand that you, having reviewed the evidence you don't have the same opinion that the police officers did. Okay. So, let me preface what I'm going to say by that. The officer made the statement that he believed that Mr. Hicks had the firearm, you agree with that, right?**
>
> A. Yes, he made that statement.
>
> **Right. And so I want to know, I want to analyze this scene if that was in fact, assuming that was the case, which I'm not asking you to say yes, Mr. Hicks had a gun, okay, I'm just saying the officer, if an officer perceived that a person had a gun in a situation like this, that's the scenario that I want to work through with you, okay?**
>
> A.· Okay. Yes. Go ahead.
>
> **Okay. So, if an officer were in a situation like this, were to encounter a person holding a firearm, is it your opinion that they would have had a duty to warn the suspect to drop the firearm?**

---

[63] *Id* at 184-185:19-8.
[64] *Id* at 161-162:18-19.

A. Not in a situation you're explaining, no, not if it was an immediate, a gun in his face, no. If he confronted an individual and the gun was in the officer's face, he needs to do what he needs to do. He needs to defend himself.

**Q.· But you were saying that that's not the situation here?**

A.· Not in my opinion, no, not at all.

**Q. Okay. And you're basing that opinion on your review of the body camera footage here and now or a month ago?**

A. Correct.

The foregoing exchanges make clear that Munday likely would be of the opinion that the officers (i) would have been in imminent fear of their lives, (ii) would not have had an obligation to warn Mr. Hicks before firing, and (iii) would not have had an opportunity to retreat before defending themselves IF, they had actually seen a firearm, "a gun in the face."  However, the record is clear that both Sgt. Wells and Officer Williams saw a firearm in Hicks' hand, and that Sgt. Wells made the statement immediately after emerging from the house and regrouping behind the police cruisers, "all I saw was, fucking gun, right there, out of his left hand."  In his deposition, Sgt. Wells said "[i]t was dark in color and I was looking down the barrel of the gun."[65]

 Consequently, Munday's opinions about the reasonableness of the officers use of force— which hinge entirely on his own credibility determination that the officers "embellished that the weapon was there"[66], based on his personal review of the body camera footage, usurp the role of jurors in making credibility determinations.   As a result, and in the absence of any meaningful discussion of standards of training, studies, research, and/or experiential analysis regarding the situation actually confronted by the officers, Munday's opinions amount to nothing more than the

---

[65] Ex. C. –Sgt. Wells Deposition Excerpt, at 161:17-18].
[66] Ex. B at p. 132:4-12.

opinions of an alternate juror, making credibility determinations to assess the "reasonableness" of the officers' use of force. Rule 702 of the Federal Rules of Evidence does not permit expert testimony on witness credibility. *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013); *United States v. Allen*, 716 F.3d 98, 106 (4th Cir. 2013) (expert opinions that evaluate witness credibility, even if rooted in scientific or technical expertise, are not admissible under Rule 702). Whether a witness is telling the truth, or whether the witness' statements are corroborated by other evidence, is well within the common knowledge and abilities of jurors. Thus, a witness' credibility is "usually within the jury's exclusive purview." *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995); *see United States v. Smith*, 30 F.3d 568, 572 (4th Cir. 1994); *see also United States v. Fuentes*, 805 F.3d 485, 495 (4th Cir. 2015) (absent "unusual circumstances"—not present here—courts must exclude expert testimony about credibility); *United States v. McDonnell*, 792 F.3d 478, 499 (4th Cir. 2015), reversed on other grounds, __ U.S. __, 136 S.Ct. 2355 (2016) ("Expert testimony cannot be used for the sole purpose of undermining a witness's credibility"). Because this improperly invades the province of the jury, and because of the particularly heightened opportunity for prejudice presented by such testimony, it should be excluded altogether. *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (internal quotations omitted); *United States v. Lester*, 254 F.Supp.2d 602, 608-09 (E.D. Va. 2003) (in evaluating usefulness of expert testimony, court must consider the fact that "[e]xpert testimony has the potential to be substantially prejudicial because of the 'aura' effect associated with such testimony").

V.  **Conclusion**

For the reasons set forth above, Plaintiff's proposed expert William David Munday lacks the expertise to offer admissible testimony regarding the issues at stake in the present case, and since his proposed testimony is nearly wholly comprised of impermissible legal conclusions based on witness credibility determinations, speculative assumptions, reasonability determinations, and other matters within the knowledge and experience of jurors, its admission would be highly prejudicial under Rule 403 of the Federal Rules of Evidence. Defendants therefore respectfully request that the Court exclude William David Munday's proposed report and deposition testimony, both at the summary judgment stage and at trial.

Respectfully submitted, this the 21st day of September, 2021

**CAULEY PRIDGEN, P.A.**

/s/ Gabriel Du Sablon_____
Gabriel Du Sablon, N.C. Bar No. 38668
James P. Cauley, III, N.C. Bar No. 14156
*Attorneys for Defendants*
2500-C West Nash Street
Wilson, NC 27896
*gdusablon@cauleypridgen.com*
*jcauley@cauleypridgen.com*
(Tel:) 252-291-3848
(Fax:) 252-291-9555

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of September, 2021, a copy of the foregoing document was served upon the Plaintiff by electronically filing the document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record for Plaintiff, as set forth below:

J. Michael Malone, Esq.
Hendren Redwine & Malone, PLLC
4600 Marriot Drive, Suite 150
Raleigh, NC 27612

This the 21st day of September, 2021.


**CAULEY PRIDGEN, P.A.**


/s/ Gabriel Du Sablon_____
Gabriel Du Sablon, N.C. Bar No. 38668
James P. Cauley, III, N.C. Bar No. 14156
*Attorneys for Defendants*
2500-C West Nash Street
Wilson, NC 27896
*gdusablon@cauleypridgen.com*
*jcauley@cauleypridgen.com*
(Tel:) 252-291-3848
(Fax:) 252-291-9555