IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:20-CV-14-FL

ANTHONY HICKS,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )
                                        )
CITY OF KINSTON, NORTH                  )               ORDER
CAROLINA; BRANDON WELLS;                )
MATTHEW AKIN; TYLER WILLIAMS;           )
and DARROW MARTIN,                      )
                                        )
                    Defendants.         )


This matter is before the court on defendants' motion for summary judgment as to all

claims pursuant to Federal Rule of Civil Procedure 56(a) (DE 33), their motion in limine (DE 31),

plaintiff's motion for sanctions (DE 46), and his objections pursuant to Federal Rule of Civil

Procedure 56(c)(2) (DE 46).  The issues raised are ripe for ruling.  For the following reasons,

defendants' motion for summary judgment is granted, their motion in limine is denied as moot,

plaintiff's motion for sanctions is denied, and his objections are overruled, sustained, and moot in

respective parts.

## STATEMENT OF THE CASE

Plaintiff commenced this action January 24, 2020, asserting that defendants Brandon Wells

("Wells"), Matthew Akin ("Akin"), Tyler Williams ("Williams"), and Darrow Martin ("Martin"),

officers with the Kinston Police Department, (collectively, the "individual defendants"), on

December 19, 2017, unlawfully entered 900 Tower Hill Road, Kinston, North Carolina, and used

excessive force against him by shooting him, both allegedly in violation of the Fourth and Fourteenth Amendments, and that these violations resulted from the patterns, practices, policies, and customs of defendant City of Kinston, North Carolina ("Kinston"), all as arising under 42 U.S.C. § 1983. Plaintiff also asserts claims of negligence and assault and battery. Plaintiff seeks compensatory and punitive damages, costs, and attorneys' fees.

In support of defendants' motion, they rely upon: 1) deposition testimony of plaintiff's expert William David Munday ("Munday"), plaintiff, and defendant Wells; 2) summaries and, in some cases, transcripts and recordings of State Bureau of Investigation ("SBI") interviews of additional officers of the Kinston Police Department, plaintiff, bystanders, emergency medical services ("EMS") workers, and the individual defendants; 3) various documents from the SBI's investigation case file, including, inter alia, a synopsis of facts uncovered; 4) the individual defendants' statements to and transcripts of their interviews with the Kinston Police Department's Office of Internal Affairs; 5) policies of the Kinston Police Department and a list of its officers' assignments; 6) documents related to the condemnation of 900 Tower Hill Road, 7) report of the responding EMS workers; 8) laboratory report of the North Carolina State Crime Laboratory; 9) footage from the body-worn cameras ("body cameras") of Stephen Reavis ("Reavis"), John Stroud ("Stroud"), and defendants Wells, Akin, and Williams, including still imagery from the footage of defendant Williams's body camera; 10) correspondence from the district attorney of Wayne, Lenoir, and Green Counties; 11) report of defendants' expert Kenneth C. Miller ("Miller"); and 12) the parties' discovery responses.[1]

---

[1] On September 20, 2021, the court allowed defendants manually to file certain video files via "flash drive." (Order (DE 30) at 1). Defendants manually filed, on September 21, 2021, a USB drive containing: 1) recordings of the SBI's interviews of Reavis, plaintiff, and defendants Wells, Akin, Williams, and Martin; 2) video from the body cameras worn by Reavis, Stroud, and defendants Wells, Akin, and Williams, as described in further detail herein; and 3) various photographs taken by the SBI and by the Kinston Police Department of the scene, plaintiff's clothing, and his belongings. Defendant Martin has represented previously that although he had his body camera on during the

2

Plaintiff filed a responsive statement of facts and the instant objections to defendants' statement of facts, pursuant to Rule 56(c)(2). Plaintiff seeks sanctions on the basis that defendants have violated the court's February 16, 2021, protective order.

Defendants also seek to exclude testimony of plaintiff's expert Munday from consideration, relying on Munday's report and deposition testimony, defendant Wells's deposition testimony, and still imagery from defendant Williams's body camera footage. In opposition, plaintiff relies on the reports of defense experts John E. Combs ("Combs") and Miller.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows.[2]

On December 9, 2017, at 5:45 p.m., the individual defendants all started their shift as a part of the Kinston Police Department's "D-shift." (Pl.'s Opp. Stmt. (DE 47) ¶ 7). They began with a briefing by Reavis, the captain for D-shift and the individual defendants' supervisor, during which a "quality of life campaign" was discussed. (Id. ¶¶ 12-13; see also Reavis SBI Interview, Ex. 37, at 00:00-23).[3]

The 900 Tower Hill Road property, which was condemned, known to be frequented by Anthony Jones ("Jones," referred to sometimes as "Tony" or "Big Tone") and his dogs, and located

---

relevant events, the camera failed to record due to pre-existing issues. (See, e.g., Martin Internal Affairs Stmt. (DE 37-6) at 11).

[2]  The undisputed facts are drawn primarily from those portions of defendants' statement of facts that are admitted or undisputed by plaintiff or to which he made an ineffectual objection. The court also relies on the body camera footage of defendants Wells, Akin, and Williams described herein. Where a fact asserted in defendants' statement of material facts is undisputed, the court cites to plaintiff's responsive statement of facts, where it indicates the fact is admitted, undisputed, without opposing fact, or only opposed on an objection deemed ineffective by court. Further, page numbers in citations to documents and briefs in the record specify the page number imposed by the court's electronic case filing system ("CM/ECF") rather than the page number showing on the face of the document, if any.

[3]  Where the manually filed videos do not contain a timestamp and are filed manually without separate docket entry numbers associated, the court's citations thereto rely on the time elapsed since the beginning of the respective video and the exhibit number associated with that video.

in an area associated with drug use and animal cruelty, was discussed. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 14-18, 35, 37-38; Wells Dep. (DE 36-4) at 61:6-62:11; Condemnation Notice (DE 38-5) at 1).[4] Defendant Wells in particular was concerned about the dogs' welfare and wanted to speak to Jones about the dogs. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 17, 19).

The individual defendants met up at 9:00 p.m. at an intersection near 900 Tower Hill Road to coordinate their approach. (Id. ¶ 51). Jones, who had interacted with defendant Wells and been arrested previously, was known to potentially hostile and violent, leading multiple officers to join with the individual defendants. (Id. ¶¶ 40-42, 47, 48).[5] The officers arrived at 900 Tower Hill Road in their respective patrol cars, wearing black duty uniforms with Kinston Police Department markings. (Wells Dep. (DE 36-4) at 145:11-25; see, e.g., Wells Body Camera Footage, Ex. 41, at 00:48, 2:18, 5:56; Williams Body Camera Footage, Ex. 44, at 1:25).

When the individual defendants approached, a person, alleged by defendants to be Corey Johnson ("Johnson"), stood outside of the condemned 900 Tower Hill Road residence, who, upon defendant Wells asking him where Jones was, went to the residence's front door. (Pl.'s Opp. Stmt. (DE 47) ¶ 80; Wells Body Camera Footage, Ex. 41, at 00:29-44). Moments later, Jones emerged at the door and agreed to speak with defendant Wells. (Wells Body Camera Footage, Ex. 41, at 00:45-46). The two discussed the condemned status of the property, which Jones contended he was renting from "Ms. Raye," identified elsewhere as Joyce Raye ("Raye"). (Id. at 00:46-1:25; Wells Dep. (DE 36-4) at 60:10-13). During the course of the conversation, defendant Wells accused Jones of "squatting" and instructed him that he needed to clear the property of himself

<hr>

[4]    Where a deposition is cited, the court relies on the pagination of the deposition transcript rather than the page number supplied by CM/ECF.

[5]    Although plaintiff purports to "disagree" with some of these statements of fact by defendants, (Pl.'s Opp. Stmt. (DE 47) ¶¶ 42, 48), he fails to provide the basis of, or indicate any evidentiary support for, his disagreement.

4

and his dogs that night or Wells would take the dogs to the "SPCA," the Society for Prevention of Cruelty to Animals, as it was wet and cold outside where the dogs were, in large part, living. (See, e.g., Wells Body Camera Footage, Ex. 41, at 3:22-32, 5:20-40, 7:38-52).

Although initially resistant, Jones eventually complied and began to remove the dogs from the property. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 88, 90; see, e.g., Wells Body Camera Footage, Ex. 42, at 01:08-04:20). The officers estimated that there were approximately eight dogs, which they described as "pitiful" and sickly looking. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 74-75). As Jones, assisted by the individual standing outside at the beginning of the encounter, worked to remove the dogs, another individual, by all indications Terrance Epps ("Epps"), exited the residence. (Wells Body Camera Footage, Ex. 41, at 6:30-40; see Pl.'s Opp. Stmt. (DE 47) ¶ 100). Eventually Jones asked if it would "be alright" if he left one dog there, which would be "gone in the morning," to which defendant Wells agreed. (Wells Body Camera Footage, Ex. 42, at 4:10-25).

Defendant Wells then sought clarification, inquiring whether there were any people or dogs left in the house, to which Jones explained that there was no one in the house but one dog, named "Marlowe," who would be leaving with Jones. (Id. at 4:25-35). However, plaintiff, in fact, was still in the residence in the back bedroom, waiting, with drugs in his pocket, for the police to leave. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 103-104; Hicks SBI Interview, Ex. 72, at 13:13-22; Hicks Dep. (DE 36-12) at 80:25-81:5).[6] In response to Jones's answers, defendant Wells asked if Jones minded if defendant Wells went in and checked the premises. (Wells Body Camera Footage, Ex. 42, at 4:35-36). As defendant Wells explained he would walk with Jones, Jones had already begun to turn

---

[6]     In contradiction with his earlier statements during his SBI interview, plaintiff asserted at his deposition that he was "[p]robably in the back room" to "clear [his] mind" after "smoking marijuana that night." (Hicks Dep. (DE 36-12) at 36:19-37:15). However, "[a] genuine issue of material fact is something on which the parties disagree, not on which one party is internally contradictory." Wilson v. Gaston County, 685 F. App'x 193, 199 (4th Cir. 2017).

around and walk to the house, causing defendant Wells to follow him. (Id. at 4:36-53). Once through the front door, Jones began to call for the dog Marlowe, who ran to him.

As defendant Wells stood just outside, he stated, "for my peace of mind, let me look in here for a minute." (Id. at 4:54-5:02). Jones moved to make way for defendant Wells as he entered the residence, explaining that he was not "going to search it." (Id. at 5:02-04). Defendant Wells then began to look, using his flashlight, in various rooms of the house, separated by curtains, while defendants Williams, Akin, and Martin trailed in behind him in that order, also with flashlights drawn. (Id. at 5:10-20; Williams Body Camera Footage, Ex. 45, at 00:00-25; Akin Body Camera Footage, Ex. 47, at 00:21-55; Pl.'s Opp. Stmt. (DE 47) ¶ 131). As defendant Wells went towards the back of the residence, he asked Jones whether there was "anybody back here," to which Jones responded, "everybody came outside." (Wells Body Camera Footage, Ex. 42, at 5:22-28).

Defendant Wells moved the curtain blocking entry into the next section of the house and immediately was met by plaintiff standing partially hidden by the doorjamb of a room to defendant Wells's right. (Id. at 5:28-31; Pl.'s Opp. Stmt. (DE 47) ¶ 158). Defendant Wells demanded plaintiff's name and that he "keep [his] hands where [defendant Wells] [could] see them," and started to explain that he did not think anybody else was in the building. (Wells Body Camera Footage, Ex. 42, at 5:31-37). At this point, plaintiff had his right hand visibly in the air. (Id.). Defendant Wells then interrupted himself, asking plaintiff "where[] [his] other hand [was] at." (Id. at 5:37-38).

Plaintiff then raised his left hand into view with what appeared to be an object in it. (Williams Body Camera Footage, Ex. 45, at 00:33-35; Still Imagery (DE 39-3) at 2-5).[7] Defendant

---

[7] Although plaintiff testified at deposition that he did not have anything in his hands, (Hicks Dep. (DE 36-12) at 151:6-7), his "version of the facts," to the extent he contends a reasonable officer would have perceived such, "is . . . contradicted by the videotape," Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008), and, therefore, the "court . . .

6

Wells ducked instantly and began firing his service weapon at plaintiff. (Williams Body Camera Footage, Ex. 45, at 00:33-37). Defendant Wells retreated to the front room of the house, and he and defendants Williams and Akin fired in the direction of plaintiff. (Pl.'s Opp. Stmt. (DE 47) ¶ 197; Akin Body Camera Footage, Ex. 47, at 1:07-17). Defendant Martin did not have a clear line of fire and, therefore, withdrew outside of the house to provide "cover" with his firearm for the other officers, although he never fired his weapon during the incident. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 234-36). After the initial barrage of gunfire, defendants Wells, Akin, and Williams fled the house, taking cover outside. (Wells Body Camera Footage, Ex. 42, at 5:39-50). Once outside, defendant Williams fired two additional shots towards the doorway of the residence to "provide cover." (Pl.'s Opp. Stmt. (DE 47) ¶ 202; Williams Body Camera Footage, Ex. 45, at 00:50-53).

Although the individual defendants fired their weapons a total of 30 times, (Defs.' Reply Stmt. (DE 50) ¶ 359), plaintiff was only hit once in the chest, by a bullet that was later determined to have been fired by defendant Wells. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 302-3; see also Hicks SBI Interview, Ex. 72, at 13:36-54 (explaining that he was knocked back immediately when defendant Wells first opened fire)). After being shot, plaintiff broke through a window and fled. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 248, 295; Hicks Dep. (DE 36-12) at 147:14-21). Defendants Martin and Williams saw plaintiff running from the residence, and when he got to a nearby intersection, plaintiff fell to the ground, (Pl.'s Opp. Stmt. (DE 47) ¶¶ 253, 255), near a storm drain, (Reavis Body Camera Footage, Ex. 49, at 00:59). Reavis, who was responding to the radio call of "shots fired," (Wells Body Camera Footage, Ex. 42, at 5:50-52; Pl.'s Opp. Stmt. (DE 47) ¶ 267), discovered plaintiff

---

[does] not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 381 (2007).

face down in the road but alive and was joined shortly by defendant Akin. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 217-218; Reavis Body Camera Footage, Ex. 49, at 00:00-01:02).

Defendant Akin searched plaintiff and found a wallet, a knife, a razor blade, and twenty dollars in cash. (Pl.'s Opp. Stmt. (DE 47) ¶¶ 221-22). Additionally, "two black velvet bags containing two plastic corners containing off-white rock material, eight off-white rocks, . . . one bag with green plant material, . . . and one black cellphone" were later recovered from plaintiff's person. (Id. ¶ 296). No firearm was recovered. (Defs.' Reply Stmt. (DE 50) ¶ 360). Although a taser was recovered from the front part of the 900 Tower Hill Road residence, (Pl.'s Opp. Stmt. (DE 47) ¶¶ 245, 251), plaintiff testified that he "must have" set it down before heading to the back room. (Hicks Dep. (DE 36-12) at 75:22-76:12).

Emergency medical services eventually arrived and transported plaintiff to the hospital. (Pl.'s Opp. Stmt. (DE 47) ¶ 273).

**COURT'S DISCUSSION**

A.    Plaintiff's Rule 56(c)(2) Objections (DE 46)

As a preliminary matter, plaintiff objects that much of the material cited by defendants to support their stated facts "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Under this rule, "[t]he court may consider . . . the content or substance of otherwise inadmissible materials where . . . the party submitting the evidence shows that it will be possible to put the information into an admissible form." Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015); Graves v. Lioi, 930 F.3d 307, 325 n.15 (4th Cir. 2019).[8] Where a party objects under Rule 56(c)(2), "the movant has the burden to

---

[8]    Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

8

show that the material is admissible as presented or to explain the admissible form that is anticipated." Id. at 538-39.

Plaintiff raises this objection to a wide breadth of defendants' exhibits relied upon in support of their statement of facts: 1) recordings of the SBI's interviews of plaintiff, the individual defendants, and individuals related to the events; 2) the transcripts and the SBI's summaries of those interviews; 3) the SBI's synopsis of the alleged events; 4) the statements of the individual defendants to and transcripts of their interviews with the Kinston Police Department's Office of Internal Affairs; 5) documents related to the condemnation of the 900 Tower Hill Road property; 6) stills from defendant Williams's body camera footage; 7) an email from the district attorney for Wayne, Lenoir, and Green Counties; 8) the report of defendant's expert Miller; and 9) documents from the SBI's case file related to the events. Plaintiff argues that these exhibits are in large part not authenticated, constitute hearsay or hearsay-within-hearsay, and are, in some parts, based on speculation.

### 1. Recorded Interviews

Plaintiff contends that the recordings of Reavis, plaintiff, and defendants Akin, Wells, Williams, and Martin (DE 44) are inadmissible hearsay. Defendants clarify that Reavis and defendants Akin, Wells, Williams, and Martin are all "potential witnesses" for trial. (Defs.' Resp. Pl.'s Obj. (DE 49) at 3-5). Thus, even if the recordings of their interviews were considered hearsay, the court would consider the "substance of [that] otherwise inadmissible material[]" as indicative of what those individuals' testimony would be at trial, in addition to that elicited during their depositions — that is, it would "be possible to put [that] information into an admissible form." Humphreys, 790 F.3d at 538. See generally 11 James William Moore et al., Federal Practice § 56.91[2] (3d ed. 2015) ("If the person who made the [hearsay] statement has personal knowledge of the relevant substance of the statement and is expected to be available to testify at trial, the

9

statement could be considered one that it would be possible to put into admissible form."). As to plaintiff, his statements during the interview do not constitute hearsay under Federal Rule of Evidence 801(d)(2) as that of an opposing party, and the recording of those statements is not an "assertion" within the meaning of Rule 801(a). See, e.g., United States v. Wills, 346 F.3d 476, 489 (4th Cir. 2003).

Plaintiff's Rule 56(c)(2) objection to these exhibits and defendants' reliance upon them in their statement of facts thus is overruled.

### 2. Interview Summaries and Transcripts

#### a. Summaries

Plaintiff contends that the SBI's summaries of interviews of Reavis (DE 36-2), Jordan Hill ("Hill") (DE 37-1), Stroud (DE 37-2), Zach Copas ("Copas") (DE 38-1), Dana Swinson ("Swinson") (DE 38-2), Sheila Karoack ("Karoack") (DE 38-3), Donnie Coward ("Coward") (DE 38-4), Mark Andrews ("Andrews") (DE 41-6), Byron Williams ("B. Williams") (DE 41-9), defendants Wells (DE 36-3), Akin (DE 36-9), Williams (DE 36-10), and Martin (DE 36-11), as prepared by Assistant Special Agent in Charge W.E. Brown Jr. ("Brown"), (see SBI Synopsis (DE 39-2) at 2), are unauthenticated hearsay-within-hearsay.

As to plaintiff's contention that these documents' ostensible lack of authentication would prevent their admission, defendants represent that these documents would be authenticated by the testimony of Brown, see Fed. R. Evid. 901(b)(1), or as public records, Fed. R. Evid. 901(b)(7). Given that "[t]he burden to authenticate under Rule 901 is not high—only a prima facie showing is required," with the "determination of whether evidence is that which the proponent claims" being "ultimately reserved for the jury," United States v. Vidacak, 553 F.3d 344, 349 (4th Cir.

2009), defendants have met their burden at this point to show that, insofar as authentication is concerned, this material is admissible or will be presented in an admissible form.

As to plaintiff's hearsay objection to the summaries of various interviews by SBI, he has, in large part, waived any objection to their admissibility by relying on the pertinent documents through acquiescing without objection their use in other instances for the truth of the matter asserted therein. See Motor Club of Am. Ins. Co. v. Hanifi, 145 F.3d 170, 175 (4th Cir. 1998) ("[T]he defendants waived any objection to the admissibility of that report when they submitted it to the court on at least three separate occasions with their motions for summary judgment."); Martin v. Harris, 560 F.3d 210, 219 (4th Cir. 2009) (explaining that a party waived his hearsay objection, in part, by presenting evidence through use of the same objected-to document); accord United States v. Katz, 601 F.2d 66, 67 (2d Cir. 1979); United States v. Anderson, 532 F.2d 1218, 1229 (9th Cir. 1976). Specifically, plaintiff has waived any hearsay objection, for the purpose of resolving this motion, to the summaries of interviews of Stroud, Swinson, Karoack, and defendant Wells, Akin, Williams, and Martin. (See Pl.'s Opp. Stmt. (DE 47) ¶¶ 183, 209-12, 219, 238, 253, 266, 273, 276, 278, 298).

As to plaintiff's hearsay objection to the summary of the interview of Reavis, that objection fails on the merits. Reavis is identified by defendants as a potential witness, (Defs.' Resp. Pl.'s Obj. (DE 49) at 17), and, therefore, the summary, itself a Rule 803(8) public record, is taken to represent what Reavis's trial testimony would be in substance. However, defendants do not identify sufficiently how Hill and Copas's statements within the summaries, as hearsay within hearsay, surmount the strictures of the rule against hearsay. Thus, the court does not rely on any statement by defendants that draws only from those documents. Finally, plaintiffs' objections to

11

the summary of Coward, Andrews, and B. Williams's interviews are moot where the court does not rely on defendants' related statements given that those facts are not material.

        b.     Transcripts

Plaintiffs maintains the transcripts of the SBI's interviews of plaintiff (DE 42-1), Epps (DE 43-1), and Johnson (DE 42-15, -16) are inadmissible, unauthenticated hearsay. Plaintiff's complaint as to the authenticity of transcripts is unavailing, where the rule requires that the movant show it is "possible to put the information into an admissible form," Humphreys & Partners, 790 F.3d at 538, rather than that the proffered "evidence [is] in a form that would be admissible at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (emphasis added). Plaintiff has waived his hearsay objection to the use of the transcript of his interview by relying upon it himself. (See, e.g., Pl.'s Opp. Stmt. (DE 47) ¶¶ 252, 255). Moreover, both parties identified plaintiff as a potential witness, and his statements out-of-court when introduced against him constitute non-hearsay under Rule 801(d)(2)(A).[9] Similarly, Epps is listed as a potential trial witness by both parties, and, thus, even assuming the transcripts of his interview "would not be admissible at trial," defendants "indicate that the substance of [his interview] is reducible to admissible evidence in the form of trial testimony." See, e.g., Catrett v. Johns-Manville Sales Corp., 826 F.2d 33, 38 (D.C. Cir. 1987).

However, defendants have failed to demonstrate that they will be able to put the information from Johnson's interviews into an admissible form for trial. Accordingly, the court does not consider information derived therefrom in adjudging whether a genuine dispute of material fact exists.

---

[9]     Plaintiff fails to explicate the ramifications in a civil case of the assertion that this interview was conducted without counsel or cite any authority from which the court could infer a legal principle from his barefaced claim.

3.     SBI Synopsis

Plaintiff objects, not upon any specific reliance of defendants on the SBI's synopsis of factual matter derived from its investigation (DE 39-2), but rather, generally, that it contains certain statements that would be inadmissible at trial. Moreover, in the limited instances in which plaintiff objects specifically to a statement in the SBI synopsis that defendants actually use in their statement of facts, the court has not relied on that portion of defendants' statement of facts. Plaintiff's objection regarding this exhibit thus is moot.

4.     Internal Affairs Statements

Plaintiff argues that the statements given by defendants Wells, Williams, Akin, and Martin during the Kinston Police Department's internal affairs investigation, including transcripts of interviews of the individual defendants, (DE 37-3, -4, -5, -6), are hearsay. Beyond asserting that the interview transcripts reveal hearsay statements from Jones, Jackie Rogers ("Rogers") (a building inspector for defendant Kinston), and an unnamed member of the community, plaintiff fails to identify with any particularity the specific instances of inadmissible hearsay he takes issue with or where defendants rely upon those specific instances. Moreover, plaintiff admits, without objection, a number of defendants' factual assertions that are based on the very hearsay to which he ostensibly objects. (See, e.g., Pl.'s Opp. Stmt. (DE 47) ¶¶ 37, 66, 85, 114, 118-19, 131, 183, 221, 224-25 238-39, 240, 276). As to the "request[]" of "a member of the community" that "police . . . make contact with individuals at 900 Tower Hill Road," (Martin Internal Affairs Statement (DE 37-6) at 3; see also Defs.' Stmt. (DE 35) ¶ 14), this statement does not constitute hearsay where it explains why the individual officers went to that location in the first instance. See, e.g., United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985) ("[A]n out of court statement is not

hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken."); accord United States v. Rios, 830 F.3d 403, 430 (6th Cir. 2016) ("[T]estimony describing a 'tip' received by law enforcement is not offered for its truth when it serves to explain an officer's subsequent actions.").

5.    Condemnation Documents

Plaintiff asserts that various documentary exhibits related to the alleged condemnation of 900 Tower Hill Road (DE 38-5, -6, -7) are unauthenticated hearsay and not relevant.  Defendants clarify that potential trial witness Rogers has firsthand knowledge of these documents and, thus, could authenticate them.  Fed. R. Evid. 901(b)(1).  Defendants sufficiently demonstrate that these exhibits or information contained therein could be presented in a form admissible at trial, as non-hearsay, see 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.10 (Mark S. Brodin, ed., Matthew Bender 2d ed. 2021) ("In the context of the rule against hearsay, photographs do not qualify as assertions."); see, e.g., United States v. Turner, 934 F.3d 794, 798 (8th Cir. 2019) ("The photographs of Turner and the cash are images, not statements, so they too are not hearsay."), or as falling under one of the hearsay exceptions, see Fed. R. Evid. 803(6), (8).

As to plaintiff's argument regarding relevancy, these facts permissibly relate to defendants' argument, considered below, that the individual defendants' entry into 900 Tower Hill Road did not violate the Fourth Amendment.

6.    Stills from Defendant Williams's Body Camera Footage

Plaintiff objects to defendants' reliance upon an exhibit containing still imagery from the footage recorded by defendant Williams's body camera, (DE 39-3), with focus on the SBI's notation that "four frames of Williams' body camera captured an object in Hicks' hand." (Still Imagery (DE 39-3) at 1).  The photographs themselves are not objectionable hearsay, and,

moreover, plaintiff relies on the footage. (See, e.g., Pl.'s Opp. Stmt. (DE 47) ¶¶ 120-22). And, where the court, below, does not rely on the SBI's commentary on the still imagery, plaintiff's objection on that basis is moot.

7.     District Attorney's Email and Miller's Report

The court does not rely on the district attorney's email (DE 39-1) or any related statement of fact by defendants and, thus, that objection is moot. Likewise, because the single statement of fact by defendants that relies upon the report of Miller (DE 40-2) is not relied upon by the court, that objection, too, is moot.

8.     SBI Case Files

Although plaintiff claims to object to defendants' reliance upon of a portion of the SBI's case file entitled "Crime Scene Search Activity of the House, Curtilage, and Area Surrounding 900 Tower Hill Road, Kinston, North Carolina 28501, Pertaining to an Officer-Involved Shooting," (DE 41-5), the instances in which defendants rely on that document to support their statements of facts are not objected to by plaintiff, (see, e.g., Pl.'s Opp. Stmt. (DE 47) ¶¶ 251, 296, 297, 299), or do not involve hearsay, (see id. ¶ 250).

B.     Motion Summary Judgment

1.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable

inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489-90.

       2.      Fourth Amendment Claims

Plaintiff claims that defendants violated his Fourth Amendment rights, applicable to the States through the Fourteenth Amendment, through both the unlawful entry and search of 900 Tower Hill Road (or that the alleged unlawfulness should otherwise impact the court's analysis of defendants' motion) and the use of excessive force in shooting him.  The court considers each in turn, but does so, specifically, in light of the individual defendants' assertion of the defense of qualified immunity.

"Qualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  Saucier v. Katz, 533 U.S. 194, 206 (2001), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  "To overcome an official's claim of qualified immunity, the plaintiff must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Attkisson v. Holder, 925 F.3d 606, 623 (4th Cir. 2019) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).  The court "may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case."  Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015).  "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong."  Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022).

a.      Claim for Unlawful Entry and Search

i.      Constitutional Violation

The Fourth Amendment provides that "[t]he right of the people to be secure in their . . . houses . . . and effects, against unreasonable searches . . . , shall not be violated."  U.S. Const. amend. IV.  "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer."  United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment[.]"  Katz v. United States, 389 U.S. 347, 357 (1967).

However, "Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted," and "[t]he capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  United States v. Ferebee, 957 F.3d 406, 412 (4th Cir. 2020).  Thus, potential Fourth Amendment claimants have been said to require "standing," which is "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search."  Byrd v. United States, 138 S. Ct. 1518, 1530 (2018).

One claiming a cognizable Fourth Amendment interest in a place searched "must show both that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."  United States v. Smith, 21 F.4th at 129 (4th Cir. 2021).  Typically, "[a] person who is aggrieved by an illegal search . . . of a third person's . . . property has not had any of his Fourth Amendment rights infringed[.]"  Rakas v. Illinois, 439 U.S. 128, 134 (1978).  "[T]o determine whether a defendant has a reasonable expectation of privacy in property that is held by

18

another, [the court] consider[s] such factors as whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property." United States v. Castellanos, 716 F.3d 828, 833-34 (4th Cir. 2013); United States v. Brown, 637 F. App'x 90, 92 (4th Cir. 2016) (applying Castellanos to defendant's "expectation of privacy in his girlfriend's apartment").

Even a person's "legitimate presence in a particular place" does not by itself establish "[a] legitimate expectation of privacy." Smith, 21 F.4th at 130. Thus, while "an overnight guest in a home may claim the protection of the Fourth Amendment, . . . one who is merely present with the consent of the householder may not." Minnesota v. Carter, 525 U.S. 83, 90 (1998); see, e.g., United States v. McLennon, 62 F. App'x 447, 448 (4th Cir. 2003) ("[Defendant] was not an 'overnight guest' . . . but was instead merely present with the consent of the householder[;] [a]ccordingly, he did not have a reasonable expectation of privacy in the area searched."). Courts have found the distinction between "temporary visitor[s]" and more permanent visitors meaningful as well as the "distinction between social guests and business visitors." United States v. Gray, 491 F.3d 138, 145 (4th Cir. 2007); see e.g., Carter, 525 U.S. at 90 (focusing on the facts that the defendants "were essentially present for a business transaction[,] . . . were only in the home a matter of hours," and had a "lack of any previous connection [with] . . . the householder").

As an initial matter, it is disputed whether Jones, himself, was the legitimate lessee of the 900 Tower Hill Road property or whether he was, as defendant Wells accused, "squatting." For the purposes of resolving this motion, the court, accepting the evidence of non-moving plaintiff, presumes that Jones was renting 900 Tower Hill Road and able permissibly to control and allow access on to the property. Even so, on the undisputed facts, plaintiff did not have a subjective and reasonable expectation of privacy in the 900 Tower Hill Road property.

19

Plaintiff testified that on December 9, 2017, he was visiting Jones, his friend he had known for five years at that time, to, inter alia, play video games. (Hicks Dep. (DE 36-12) at 11:20, 15:1-2). He had arrived around 8:00 p.m. that evening and was not intending to stay the night. (Id. at 15:21-23, 20:14-18). Moreover, there were not any beds in the house to sleep on or electricity beyond that provided by the generator, connected that night to the television and a gaming console. (Id. at 20:19-21:6, 24:12-19).

Even assuming that plaintiff had a subjective expectation of privacy in the 900 Tower Hill Road property, on the undisputed facts, he did not have one that is reasonable "by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Carter, 525 U.S. at 88; see also Ferebee, 957 F.3d at 416 ("[T]he ultimate question of whether a given set of facts gives rise to a reasonable expectation of privacy is a legal question."). Plaintiff resembles much more the "temporary visitor," Gray, 491 F.3d at 145, or "one who is merely present with the consent of the householder" "for a matter of hours," Carter, 525 U.S. at 90, than the type of "overnight guest" contemplated by the Supreme Court. See, e.g., Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). There is no indication that plaintiff "claim[ed] an ownership or possessory interest in the property" or "ha[d] established a right or taken precautions to exclude others from the property." Castellanos, 716 F.3d at 833-34. The fact alone that plaintiff was not a business guest does not establish his reasonable expectation of privacy. See, e.g., Brown, 637 F. App'x at 92.

Moreover, although not dispositive, the fact that plaintiff was engaged in illegal activity, possession of marijuana, see 21 U.S.C. §§ 802(6), 812, 844; N.C. Gen. Stat. §§ 90-87(5), 90-94(1), 95(a)(3), in a property marked as condemned further lowers or makes unreasonable any expectation of privacy plaintiff may have had in the property. See, e.g., Gray, 491 F.3d at 146

("[T]hose who venture forth to conduct illegal business often do not hold a legitimate expectation of privacy in locations that are not their own. Someone who hides illegal activity in a[n] . . . abandoned warehouse . . . takes his or her chances that law enforcement officials will happen upon incriminating evidence."). In addition, the repeated comments by Jones that no one was in the building indicate that plaintiff was no longer a welcome guest of Jones, the individual that plaintiff claims validly controlled access to the property. See Rakas, 439 U.S. at 143 n.12 (explaining that an individual who is "wrongful[ly]" "present" does not have a "legitimate" expectation of privacy); see, e.g., United States v. Saint-Brice, 1 F. App'x 232, 234 (4th Cir. 2001) (focusing on the fact that defendant "lacked permission to be present from either the owner of the property or the lessee" and therefore "his presence was wrongful").

Additionally, and in the alternative, Jones implicitly consented to the individual defendants' presence on the property such that concerns that "it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest" are negligible, negating plaintiff's expectation of privacy in the property. Georgia v. Randolph, 547 U.S. 103, 113 (2006) (citing Olson, 495 U.S. at 99). Further, such implicit consent by Jones, implicates an exception to the warrant requirement.

"Consent searches" are a "categor[y] of permissible warrantless searches [that] have long been recognized." Fernandez v. California, 571 U.S. 292, 298 (2014). "Consent may be inferred from actions as well as words." United States v. Hylton, 349 F.3d 781, 786 (4th Cir. 2003). "Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent." United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). Properly authorized consent may come "either from the individual whose property is searched or from a third party who possesses common authority over the premises." United States v. Azua-Rinconada, 914 F.3d

21

319, 324 (4th Cir. 2019).  However, "a warrantless entry is [still] valid [if] based upon the consent of a third party whom the police, at the time of entry, reasonably believe to possess common authority over the premises, but who in fact does not."  Illinois v. Rodriguez, 497 U.S. 177, 179, 186 (1990).

"The question whether consent to search is voluntary . . . is one of fact to be determined from the totality of all the circumstances."  Azua-Rinconada, 914 F.3d at 324.  "In viewing the totality of the circumstances," the court "consider[s] the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)."  United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996).  Specifically, consent "premised on a law enforcement officer's misstatement of his or her authority" is not voluntary.  United States v. Saafir, 754 F.3d 262, 266 (4th Cir. 2014) (citing Bumper v. North Carolina, 391 U.S. 543, 547-50 (1968)); Bumper, 391 U.S. at 550 ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.").

Given the fact-intensive nature of the inquiry here, a brief review of the exact circumstances of Jones's alleged consent, based on the undisputed facts, is necessary.  Defendant Wells and Jones's encounter began consensually, with defendant Wells asking if he could "speak at [Jones] for a minute" to which Jones replied, "Sure."  (Wells Body Camera Footage, Ex. 41, at 00:47-49).  In the body camera footage, Jones presents as articulate, intelligent, and aware of his surroundings, (see, e.g., id. at 00:56-02:16), despite smelling of marijuana use.  (Pl.'s Opp. Stmt. (DE 47) ¶ 66).  During his conversation with Jones, defendant Wells asserted that he had spoken with Raye, the owner of the 900 Tower Hill Road property, and that she was telling a different

story than Jones as to whether Jones was renting the property or otherwise permissibly on the property. (Wells Body Camera Footage, Ex. 41, at 2:16-53). Thus, according to defendant Wells, since "the property was condemned," Jones "need[ed]" "to find another place for [his] dogs" and "vacate the property." (Id. at 2:53-3:08). When Jones objected, defendant Wells narrowed his focus, explaining that Jones could "either do something with the dogs" or defendant Wells would take them to the SPCA. (Id. at 03:08-27).

However, defendant Wells, in fact, did not have an order for Jones's eviction and had not talked to Raye, but rather had talked to Rogers, a building inspector for defendant Kinston and a reserve officer of the Kinston Police Department, who had spoken with Raye. (Defs.' Reply Stmt. (DE 50) ¶¶ 324, 327; Wells Dep. (DE 36-4) at 211:19-212:04). Rogers represented to defendant Wells that Raye had told him that she had clashed with Jones over rent and was trying to evict him or have him charged criminally. (Wells Dep. (DE 36-4) at 212:11-24).[10]

At some point, at least 15 minutes later, (see Wells Body Camera Footage, Ex. 41, at 03:37-15:27, Ex. 42, at 00:00-04:25), Jones requested that he leave one dog overnight, and, based on Jones's "cooperative" behavior, defendant Wells agreed. (Id., Ex. 42, at 04:22-25; Pl.'s Opp. Stmt. (DE 47) ¶ 88). However, defendant Wells followed up by asking if any dog or "anyone [was] left in the house" and whether Jones "mind[ed] if [defendant Wells] went in there and checked." (Wells Body Camera Footage, Ex. 42, at 04:25-36). As Jones turned around, defendant Wells commented that he would "walk with [Jones]. Come on." (Id. at 04:36-38).

---

[10] The court does not accept Raye's out-of-court statement to Rogers nor Rogers's out-of-court statement to defendant Wells for the truth of the matter asserted, as would implicate multiple levels of hearsay. Rather, the court accepts these statements only for the effect each statement had on the listener, that is, non-hearsay. See Graves, 930 F.3d at 325 n.15; McMichael v. James Island Charter Sch., 840 F. App'x 723, 730 (4th Cir. 2020) (explaining that "effect on the listener" extends to "a reason to act" on the part of the listener).

Once at the door, Jones called for the remaining dog, Marlowe, and began to turn around. (Id. at 4:38-55). Defendant Wells then stated, "For my peace of mind," "let me look in here for a minute," with the ostensible assurance that he would not "search it." (Id. at 4:55-5:00). Jones moved to the side, and defendant Wells entered the premises. (Id.).

The first circumstance pertinent to the voluntariness of Jones's consent is defendant Wells's assertion that the condemned nature of the property and/or Raye's lack of permission necessitated Jones and the dogs leaving the property. Although, it was not true that defendant Wells had spoken to Raye, the fact defendant Wells had been told, whether truthfully or not, that Jones had not been paying his rent and was "squatting" moves this case beyond the Fourth Circuit's jurisprudence on "deceitful misrepresentations" that invalidate an otherwise valid consent to a search. See, e.g., Vizbaras v. Prieber, 761 F.2d 1013, 1017 (4th Cir. 1985).

As to defendant Wells's claim that Jones needed to vacate the property, he shortly thereafter relented on this demand, explaining, instead, that his focus was the dogs, as evidenced by his ultimatum that Jones remove the dogs or defendant Wells would take them to the SPCA. It is not immediately clear that either invocation of authority by defendant Wells was false, as was the case in Bumper, 391 U.S. at 550 (examining factual context of officers falsely asserting they had a search warrant). Although Jones claimed he had been informed he had 60 days to improve the property, the presence of the condemnation notice, (see Wells Body Camera Footage, Ex. 41, at 3:38; Condemnation Notice Picture (DE 38-7) at 3; Condemnation Notice (DE 38-5) at 1), indicates that the property may have already been subject to vacation. See N.C. Gen. Stat. § 160A-443(4) (repealed 2019).[11] Further, the dogs, as probable evidence of animal abuse, see N.C. Gen.

---

[11] Plaintiff contends that the sign was a N.C. Gen. Stat. § 160A-426 (repealed 2019) notice and was merely evidence that a hearing to order vacation of the property could be noticed. The point is moot ultimately, as any reasonable officer could have made such a "mistake of law" as would allow qualified immunity. See Pearson, 555 U.S. at 231 (2009); see also Kinston, N.C., Code § 5-63(a) (available at: https://library.municode.com/nc/kinston

Stat. § 14-360(a); see, e.g., State v. Coble, 163 N.C. App. 335, 338 (2004) (noting that evidence that the "dogs were tied up with no shelter, food, or water" and "had been allowed to become emaciated . . . . was sufficient evidence that defendant acted intentionally under the cruelty to animals statute"), based on the on-the-scene officers' commentary, were able to be seized temporarily "without a warrant" based on "the exigencies of the circumstances," United States v. Grinder, 808 F. App'x 145, 147 (4th Cir. 2020), that is, the inhospitable weather that night.

Moreover, these misstatements of defendant Wells's authority, assuming they were such, were separated in time from the later attempts to garner Jones's consent such that, even on the undisputed facts, the court cannot conclude that they "fatally infect[ed] the voluntariness of the consent." Azua-Rinconada, 914 F.3d at 324 (concluding that agents' ultimatum that an occupant could "open the door or we're going to knock it down" did not invalidate her consent to the search). Even viewing the record in the light most favorable to plaintiff, there is not sufficient evidence for a reasonable jury to conclude that the statements by defendant Wells "critically impair[ed]" Jones's ability to voluntarily consent to the search. See United States v. Pelton, 835 F.2d 1067, 1071-73 (4th Cir. 1987); see also Anderson, 477 U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). Given the context of the statements and defendant Wells's follow-up explanations and conduct, at the time Jones's consent was sought, it cannot be said he was presented with a situation in which the individual defendants had "announce[d] in effect that [Jones] ha[d] no right to resist the search." Bumper, 391 U.S. at 550; United States v. Scott, 463 F. App'x 216, 218 (4th Cir. 2012)

---

/codes/code_of_ordinances?nodeId=PTIICOOR_CH5BUBURE_ARTIIMIHOCO_DIV2ADEN_S5-63OWFACOOR); Kinston Pub. Servs., Ordinances, Plans & Policies, https://www.ci.kinston.nc.us/291/Ordinances-Plans-Policies (explaining that the city's ordinances are hosted online by Municode).

(explaining that "[m]ere acquiescence to a claim of lawful authority [to search] is insufficient to constitute consent").

Instead, Jones's conduct reflects "voluntary consent to a request versus begrudging submission to a command," United States v. Robertson, 736 F.3d 677, 680 (4th Cir. 2013), especially where it is undisputed that at the point at which consent was sought, Jones was already acting cooperatively. There is nothing in the record indicating that defendant Wells "ever acted aggressively or coercively" or "detain[ed] or arrest[ed]" Jones; "and nothing in the record suggests that any of [Jones's] personal characteristics made h[im] particularly susceptible to coercion." United States v. Gomez-Zunun, 751 F. App'x 374, 377 (4th Cir. 2018). Further, the fact that there were four officers present provides no basis in this instance to infer a coercive environment, see, e.g., United States v. Elie, 111 F.3d 1135, 1145-46 (4th Cir. 1997) (finding consent to be voluntary despite there being at least six officers present), especially, given that Jones was accompanied by a number of compatriots.

In sum, on the record before the court, Jones consented, as implied by his turning and approaching the house in response to defendant Wells's first comments and his moving to the side in response to defendant Wells's second comments, voluntarily to the search of 900 Tower Hill Road. As a final matter, if, as plaintiff argues alternatively, Jones could not give consent to search the home, Jones then, of course, could not have consented to plaintiff as a house guest, meaning plaintiff would lack any reasonable expectation of privacy in the 900 Tower Hill Road property.

    ii.  Clearly Established Right

Even assuming that the individual defendants could be said to have entered 900 Tower Hill Road unlawfully, it was not in violation of any clearly established right of plaintiff.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 170 (4th Cir. 2016). As explicated above, the individual defendants' conduct regarding entry of the property was lawful, and, to the extent plaintiff contends otherwise, "qualified immunity is appropriate if reasonable officers could disagree on the relevant issue." Swanson v. Powers, 937 F.2d 965, 968 (4th Cir. 1991).

In short, either as a matter of an actual constitutional violation or as a matter of qualified immunity, plaintiff's claim based on the individual defendants' entry into the property fails given defendants' entitlement to judgment as a matter of law on the undisputed, material facts.

        b.     Claim for Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). "[P]olice officers are constitutionally permitted to use only that force which is reasonable under the circumstances." Hupp v. Cook, 931 F.3d 307, 321 (4th Cir. 2019). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; see also Kingsley v. Hendrickson, 576 U.S. 389, 399 (2015) ("[A] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."); Saucier, 533 U.S. at 207 ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred").

"The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott

v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). "[P]roper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In addition, the court may consider "[t]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; [and] any effort made by the officer to temper or to limit the amount of force." Kingsley, 576 U.S. at 397 (hereinafter, the "Graham factors").

"The intrusiveness of a seizure by means of deadly force is unmatched." Tennessee v. Garner, 471 U.S. 1, 9 (1985). "When deadly force is used," the court must consider whether a "hypothetical reasonable officer in that situation would have had probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." Stanton, 25 F.4th at 233 (emphasis omitted). However, the "[o]fficer[] need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm — the Constitution does not require that certitude precede the act of self protection." Elliott, 99 F.3d at 644.

       i.      Defendants Akin, Williams, and Martin,

Plaintiff's excessive force claims against defendants Akin, Williams, and Martin raise a preliminary issue where it is undisputed that defendant Martin never fired his weapon and defendants Akin and Williams missed all of their shots.[12]

To "seize[]" an individual, an officer must "employ physical force or a show of authority that in some way restrains the liberty of the person." United States v. Cloud, 994 F.3d 233, 242

---

[12] As the Fourth Circuit repeatedly has explained, "[t]he number of shots by itself cannot be determinative as to whether the force used was reasonable," Elliot, 99 F.3d at 643, and, moreover, presents a separate question than whether a seizure cognizable by the Fourth Amendment actually occurred.

(4th Cir. 2021).  Thus, an officer does not seize an individual if the officer's show of force does not either physically touch the individual or compel him or her to submit to the officer's authority. See California v. Hodari D., 499 U.S. 621, 626-27 (1991).  Accordingly, "no seizure occurs when a law enforcement officer shoots at a fleeing suspect but fails to hit him and halt his movement." Gandy v. Robey, 520 F. App'x 134, 141 (4th Cir. 2013); accord Cabell v. Rousseau, 130 F. App'x 803, 807 (7th Cir. 2005) (collecting cases for the proposition that "a number of circuits . . . [have] conclude[d] that no seizure took place where the officers' shots neither struck nor stopped the plaintiff"); see, e.g., Cameron v. City of Pontiac, 813 F.2d 782, 785 (6th Cir. 1987) ("The officers' show of authority by firing their weapons, while designed to apprehend Cameron, did not stop or in any way restrain him."); Lawson v. McNamara, 438 F. App'x 113, 116 (3d Cir. 2011) ("McNamara shot at Lawson and missed and Lawson fled the scene. Because Lawson did not yield to McNamara's show of authority, the Fourth Amendment is not implicated.").

Accordingly, any constitutional liability on these defendants' part for plaintiff's gunshot wound must arise under what has been termed "bystander liability."  Randall v. Prince George's County, 302 F.3d 188, 203-04 (4th Cir. 2002).  "[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  Id. at 204 (footnote omitted).  Putting aside for this inquiry the merits of plaintiff's claim against defendant Wells, which the court addresses further below, the undisputed facts fail to evidence any reasonable opportunity by defendants Akin, Williams, and Martin to prevent defendant Wells from firing during the seven seconds leading up to defendant Wells first shooting at plaintiff.

Plaintiff's excessive force claims against defendants Akin, Williams, and Martin fail as a matter of law on the undisputed, material facts, and, thus, defendants' motion for summary judgment on those claims is granted.

ii.     Defendant Wells

The first <u>Graham</u> factor, "the severity of the crime at issue," is of negligible import where, from the perspective of a reasonable officer in defendant Wells's position, viewing the undisputed facts in the light most favorable to plaintiff, plaintiff had not committed any crime at all.  <u>See</u> <u>Smith v. Ray</u>, 781 F.3d 95, 102 (4th Cir. 2015) (explaining the pertinent question as whether the "offense was . . . the type that would give an officer any reason to believe that [the decedent] was a potentially dangerous individual"); <u>see, e.g.</u>, <u>Knibbs v. Momphard</u>, 30 F.4th 200, 215 (4th Cir. 2022) (explaining that, in certain factual scenarios, the first <u>Graham</u> factor will "not [be] particularly germane to [the court's] analysis").  Similarly, the <u>Graham</u> factor concerning resisting arrest or evading arrest by flight is inapplicable on the quick-paced but chronologically brief situation faced by an officer in defendant Wells's position.  Finally, the extent of plaintiff's injury is not especially pertinent to the court's analysis in this instance where it is undisputed that defendant Wells employed deadly force, that is, the happenstance that defendant Wells's bullet did not kill plaintiff does not inform as to the reasonableness of using deadly force in the first place.

Instead, a more germane factor is whether defendant Wells made "any effort to temper . . . or limit the amount of force," <u>Kingsley</u>, 576 U.S. at 397, considering only "the circumstances confronting the officer immediately prior to and at the very moment he fired his weapon."  <u>Betton v. Belue</u>, 942 F.3d 184, 191 (4th Cir. 2019); <u>see, e.g.</u>, <u>Stanton</u>, 25 F.4th at 235 n.6 (explaining that a "theory" "that it was wrong for the troopers to fail to use non-lethal measures like pepper spray to restrain [decedent] earlier in the encounter . . . [was] cleanly cut off by [United States Court of

Appeals for the Fourth Circuit] precedent, which limits [the court's] consideration to the moment when deadly force was used"). Yet, "a warning must be given before deadly force when feasible," although "it is not feasible to give a warning when there is an immediately threatened danger." Stanton, 25 F.4th at 235 n.6; see, e.g., McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) (explaining that a warning is not feasible if "the hesitation involved in giving a warning could readily cause such a warning to be [the officer's] last").

Further, "[n]on-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect." Estate of Jones ex rel. Jones v. City of Martinsburg, 961 F.3d 661, 670-71 (4th Cir. 2020). Rather, "noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance." Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 901 (4th Cir. 2016). Finally, an officer's attempts to identify him or herself as a police officer informs the inquiry where an individual's reaction to law enforcement apprises whether they are "likely to pose a deadly threat." Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013); see, e.g., Betton, 942 F.3d at 192 (explaining that the "[defendant-officer] shot [plaintiff], . . . without first identifying himself as a member of law enforcement or giving any commands to [plaintiff]").

Here, although defendant Wells did not expressly identify himself as a police officer, it reasonably was apparent to all in the house that law enforcement was on the scene. (See, e.g., Hicks SBI Interview, Ex. 72, at 13:12-22 (explaining that he "didn't think they[, the police,] were going to come in the back like that" and confirming that he was in the back of the house waiting "for them to leave"); id. at 20:43-21:49 (explaining that "when [defendant Wells] shined that light on me, I knew he was the police"); Pl.'s Opp. Stmt. (DE 47) ¶ 97).[13] Although the parties disagree

---

[13] Plaintiff has contradicted himself on this fact. (See, e.g., Hicks SBI Interview, Ex. 72, at 9:40-50; id. at 18:32-47; id. at 19:59-20:28; Hicks Dep. (DE 36-12) at 40:14-21). However, as already noted, "a party against whom

as to whether plaintiff raised both of his hands after defendant Wells commanded him to keep his hands where defendant Wells could see them, defendant Wells, as evidenced contemporaneously in the body camera footage and later during his deposition, has represented that he was unable to see both of plaintiff's hands.  (See, e.g., Wells Body Camera Footage, Ex. 42, at 5:34-38 ("Where's your other hand at?"); Wells Dep. (DE 36-4) at 168:7-11.  See generally Anderson v. Russell, 247 F.3d 125, 130 (4th Cir. 2001) ("In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer.").  Plaintiff points to nothing in the record indicating that a reasonable officer with the same "perspective and . . . knowledge of the defendant officer" would observe differently.  See Kingsley, 576 U.S. at 399.

Accordingly, a reasonable officer, in defendant Wells's position, would discern some degree of threat to his or her person when faced, from his or her perspective, with an individual who was unwilling, in the face of repeated commands, to show the officer both hands.  See Smith, 781 F.3d at 104 (explaining that "an officer . . . may legitimately be concerned that a suspect is holding a weapon any time the officer cannot see the suspect's hands" but the officer must "offer[] . . . [a] reason for actually believing [the suspect] had a weapon other than the fact that she refused to submit to him by giving him her hands");  see, e.g., Slattery v. Rizzo, 939 F.2d 213, 215 (4th Cir. 1991) (examining circumstances in which defendant-officer could not view plaintiff's hand but reasonably believed it to be a weapon).  What degree of force was reasonable in light of this perceived refusal and whether a warning before that force was used was feasible depend on what happened immediately after, as discussed below.

---

summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 186 n.7 (4th Cir. 2001); see also S.P. v. City of Takoma Park, 134 F.3d 260, 273 n.12 (4th Cir. 1998) (explaining that plaintiff's "later denial of her statements does not create a genuine issue of a material fact").

Turning to the final and dispositive <u>Graham</u> factor, whether the suspect poses an immediate threat to the safety of the officers or others,[14] the situation with which a reasonable officer was faced, without any consideration of defendant Wells's personal motives or intent, <u>see</u> <u>Rowland v. Perry</u>, 41 F.3d 167, 173 (4th Cir. 1994), is as follows: an unknown, wholly unexpected individual in a dark area of the house, declared to be empty, encountered at close range and reasonably perceived to be resisting a command to show his concealed hand. The sequence of events that followed, although not captured perfectly by the body camera footage, is encapsulated to the degree that a reasonable officer's perception can be ascertained.

And relying on that depiction, even assuming that a genuine dispute as to a material fact remained regarding whether defendant Wells used excessive, and therefore Fourth Amendment violative, force against plaintiff, no genuine dispute as to a material fact remains as to whether defendant Wells violated a clearly established right of plaintiff.

To focus the examination of the relevant body camera footage, clarification of the exact right at issue is necessary. In the context of an excessive force claim, the right that needs to be clearly established is not the "general" right to be free from excessive force; rather, the court's inquiry should focus on "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation she confronted." <u>Mullenix v. Luna</u>, 577 U.S. 7, 12-13 (2015) (per curiam); <u>see, e.g.</u>, <u>Betton</u>, 942 F.3d at 194 (framing the relevant inquiry as "whether it was clearly established in April 2015 that shooting an individual was an unconstitutional use of excessive force after the officer: (1) came onto a suspect's property; (2) forcibly entered the suspect's home while failing to identify himself as a member of law enforcement; (3) observed

---

[14] In this instance, the court treats the factor of "[t]he relationship between the need for the use of force and the amount of force used," <u>Kingsley</u>, 576 U.S. at 397, as subsumed or otherwise contemplated by the inquiry into whether deadly force was warranted, where deadly force is only warranted where the officer has "probable cause to believe that the suspect pose[s] a threat of serious physical harm, either to the officer or to others." <u>Stanton</u>, 25 F.4th at 233.

inside the home an individual holding a firearm at his side; and (4) failed to give any verbal commands to that individual"). Accordingly, the court focuses its inquiry on "whether a reasonable officer could have believed that the use of force . . . was objectively reasonable in light of the circumstances." Rowland, 42 F.3d at 173; McLenagan, 27 F.3d at 1007 ("[I]f a reasonable officer possessing the same particularized information as [defendant government official] could have, in light of [then-controlling law], believed that his conduct was lawful, then [defendant government official] is entitled to qualified immunity.").

In making this inquiry, the court looks to "the specific context of the case" to determine "whether the violative nature of [defendant Wells's] particular conduct [was] clearly established." Mullenix, 577 U.S. at 12. The court does so without resolving the disputed factual question of whether plaintiff actually had a firearm or other object in his left hand, which in this instance is not a fact material to the determination of defendant Wells's entitlement to qualified immunity. See Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998) ("[W]e reject the argument that a factual dispute about whether Sigman still had his knife at the moment of the shooting is material to the question of whether Officer Riddle is entitled to . . . qualified immunity[.]"); see also Rogers v. Pendleton, 249 F.3d 279, 292-93 (4th Cir. 2001) (construing Sigman as holding "given the volatile and dangerous atmosphere and the need to make a split-second self-defense decision, the question of whether the suspect had a knife was not necessarily material to the question of whether a reasonable officer could have perceived him to be a violent threat"). Instead, "the proper inquiry is whether the officers reasonably and objectively believed that their safety was in danger." Cunningham v. Hamilton, 84 F. App'x 357, 358 (4th Cir. 2004). "And an officer need not see the weapon in a suspect's hands to find him objectively dangerous." Stanton, 25 F.4th at 234-35.

There is no genuine dispute of material fact regarding whether a reasonable officer in defendant Wells's position could have believed that the use of deadly force was objectively reasonable. See Anderson, 247 F.3d at 131 ("[D]iscrepancies between the officers' testimony and [others] testimony about the positioning and speed at which [plaintiff-decedent] was lowering his hands do not raise an issue of triable fact."). Defendant Williams's body camera footage "clearly" and "blatantly" contradicts any suggestion by plaintiff that a hypothetical officer in defendant Wells's position would not have perceived a swift movement by plaintiff's left hand with what appeared to be an object in it. See Hupp, 931 F.3d at 315. Although plaintiff disputes the facts of whether he actually had an object in his left hand and whether he had both hands raised, he, as the nonmovant, fails to "point to significant probative evidence" that raises a factual dispute, Webster v. Chesterfield Cnty. Sch. Bd., 38 F.4th 404, 412 (4th Cir. 2022), as to what defendant Wells perceived or what an officer in his position would have perceived: the "unanimous[] testi[mony]" by the "officers closest to the encounter . . . [is] that they perceived the suspect to be armed," as buttressed by video footage. See Rogers, 249 F.3d at 292; (see e.g., Wells Body Camera Footage, Ex. 42, at 7:38-40; Wells Dep. (DE 36-4) at 135:13-14, 152:19-153:1; Williams Internal Affairs Statement (DE 37-4) at 3-4, 8). Therefore, "[i]n the absence of a genuine dispute as to the reasonableness of the officers' perceptions, the issue of qualified immunity is ripe for summary judgment." Gooden v. Howard County, 954 F.2d 960, 965-66 (4th Cir. 1992) (en banc) (explaining that no evidence had been offered to the effect "that the officers' mistaken perception—if in fact it was mistaken—was unreasonable").

Even crediting plaintiff's account, the video footage captured by defendant Williams's body camera depicts a fast motion near the doorjamb to the right of defendant Wells, meaning on plaintiff's left. (Williams Body Camera Footage, Ex. 45, at 00:34). What resembles some sort of

object that momentarily alights is visible over defendant Wells's right arm and shoulder as he begins to duck down and to his left. (Id.; Still Imagery (DE 39-3) at 2-4). The footage then devolves into confusion as the various officers begin to fire and retreat. (See, e.g., Williams Body Camera Footage, Ex. 45, at 00:35-41; Wells Body Camera Footage, Ex. 42, at 5:38-49).

In these particular circumstances, the court's analysis must, as commanded by the Supreme Court, make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 396-97, exactly the circumstances with which defendant Wells was faced. Being met by an unexpected individual in relative darkness who appears to be concealing a hand, despite commands to the contrary, is an indisputably tense, uncertain, and rapidly evolving situation, especially when faced over the span of less than a dozen seconds. To then be confronted with a perceived "sudden move" by the individual seemingly ignoring one's commands would give a reasonable officer sufficient reason to believe that the use of force could be objectively reasonable, regardless of whether the force used was actually excessive. Compare, e.g., Cooper, 735 F.3d at 159 (concluding that a lack of "sudden moves," threats, or ignored commands would allow a reasonable juror to find an officer confronted with such had no "probable cause to feel threatened by [the individual's] actions"), with Slattery, 939 F.2d at 215-16 (considering officer's shooting of a suspect who ignored commands to show his hands before turning quickly toward the officer with what turned out to be only a beer bottle in a clinched fist).

In light of that conclusion, on the undisputed facts, defendant Wells is due qualified immunity because he did not violate any of plaintiff's clearly established rights. At the time of the shooting, it was clearly established that an officer "need not be absolutely sure . . . of the nature of the threat" before acting. Elliot, 99 F.3d at 644. Further, the Fourth Circuit has explained that

circuit precedent "clearly establish[es] that the failure to obey commands by a person . . . suspected to be in possession of[] a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person." Knibbs, 30 F.4th at 225 (relying on pre-December 2017 holdings). In contrast to cases in which the Fourth Circuit has declined to extend qualified immunity, defendant Wells reasonably perceived plaintiff "ma[ke] . . . sudden moves" related to "potential weapons in disregard of officers' verbal commands." Betton, 942 F.3d at 192.

At base, regardless of whether plaintiff actually had an object or firearm in his left hand, "a reasonable officer nevertheless could have had probable cause to believe that the plaintiff posed a deadly threat," Hensley ex rel. North Carolina v. Price, 876 F.3d 573, 585 (4th Cir. 2017), based on his or her perception of plaintiff's actions. In considering whether "a reasonable official would have understood that the . . . conduct was unlawful," Betton, 942 F.3d at 193, a reasonable official could rely on the Fourth Circuit's explanation that "once [an] officer issue[s] a verbal command, the character of the situation transform[s]" because "[i]f an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." Hensley, 876 F.3d at 585. As Hensley recognizes, "[e]ven when those intentions turn out to be harmless in fact . . . , the officer can reasonably expect the worst at the split-second when he acts." Id.

Plaintiff points to no pre-December 9, 2017, case that fairly can be said to have "provided fair warning, with sufficient specificity, that [defendant Wells's] actions would constitute a deprivation of [plaintiff's] constitutional rights." Betton, 942 F.3d at 193-94. While plaintiff relies on Crockett v. Blackwood, No. 1:18-CV-809, 2020 WL 1144710, at *1 (M.D.N.C. Mar. 9, 2020),

and its analysis and/or description of <u>Cooper</u> and <u>Hensley</u>, <u>Crockett</u> cannot serve as clearly established law given the date of its issuance and the court that decided it, <u>see</u> <u>Betton</u>, 942 F.3d at 193 ("Decisions by the Supreme Court, this Circuit, and the highest court of [the relevant state] are relevant on the issue of notice to [the officer] concerning clearly established constitutional rights.").[15]  Further, <u>Cooper</u> and <u>Hensley</u> separately or combined would not "place[] the . . . constitutional question" of whether defendant Wells used excessive force "beyond debate" given those cases' factual dissimilarity.  <u>Rivas-Villegas v. Cortesluna</u>, 142 S. Ct. 4, 8 (2021) (per curiam); <u>see also</u> <u>Mullenix</u>, 577 U.S. at 12 ("[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.").

Neither <u>Cooper</u> or <u>Hensley</u> considered circumstances in which an officer is confronted with an unknown, wholly unexpected individual in a dark area of the house, declared to be empty, encountered at close range and reasonably perceived to be resisting a command to show his concealed hand that then makes a rapid movement with what presents as an object in his hand. <u>Cooper</u> considered a mobile home's occupant stepping onto his darkened porch with a shotgun, but otherwise making "no sudden moves," and being shot by officers who "never identified themselves—even when asked by [plaintiff]" or otherwise gave him any command.  735 F.3d at 159.  Similarly, in <u>Hensley</u>, officers responding to a domestic disturbance shot a home's occupant as soon as he stepped off of his porch while holding a handgun, despite the facts that the handgun was pointed towards the ground, he never made a threatening statement or action, and giving a warning was feasible prior to using deadly force.  876 F.3d at 583-84.

---

[15]    Moreover, the analysis in <u>Crockett</u> is inapposite here, where that case considered officers' shooting of a home's occupant as soon as he opened the door of his home with a downward facing gun, despite the officers' lack of warnings or commands.  <u>Crockett</u>, 2020 WL 1144710, at *5.

Here, there is no genuine dispute that an officer in defendant Wells's position would have reasonably, if mistakenly, perceived plaintiff's previously unseen left hand appear with what looked like an object in it after previously not displaying his hand in the officer's field of view, despite the officer's commands.  See Smith v. Ray, 409 F. App'x 641, 649 (4th Cir. 2011) (emphasizing the importance of the existence of genuine "conflicting accounts concerning what the officer actually perceived with respect to the suspect" in preventing summary judgment). Additionally, neither case considered the import of an officer unexpectedly encountering an individual at close range, in the dark, after being told the building was empty by a person with reason to know (as opposed to encounters with individuals coming out of their own homes to confront potential intruders).  Finally, even absent those cases, "this case simply is not an obvious one, permitting [the court] fairly to say that the decisions in Garner and Graham, on their own, clearly established the right at issue."  Wilson v. Prince George's County, 893 F.3d 213, 224 (4th Cir. 2018).

Beyond the arguments addressed by the very nature of the court's holding,[16] plaintiff further argues that because "the officers never announced they were law enforcement officers including during [defendant Wells] confrontation with [p]laintiff," they are "deprive[d] . . . of the protection afforded by qualified immunity."  (Pl.'s Resp. (DE 48) at 23).  Neither of the cases cited by plaintiff announce such a bright line rule.  The court in Cooper, as explained above, discussed the officers' failure to identify themselves as police officers as merely one factor in its analysis.  See 753 F.3d at 160.  Likewise, in Betton, the officer's failure to identify himself as police before

---

[16]    Suggestion by plaintiff that upon encountering him the individual defendants should have just withdrawn from the situation is a "suggestion more reflective of the 'peace of a judge's chambers' than of a dangerous and threatening situation" and calls for post-hoc "armchair reflection."  Elliot, 99 F.3d at 642-43.

or during forced entry into plaintiff's home was just one factor considered alongside the officer's failure to give any commands or warnings to plaintiff. See 942 F.3d at 192.

In sum, the court concludes that, under the second prong of the qualified immunity analysis, defendants have demonstrated that, even if the facts are viewed in plaintiff's favor, "a reasonable officer could have had probable cause to believe that [plaintiff] presented a serious threat of personal harm at the time that d[efendant Wells's] pulled the trigger." Slattery, 939 F.2d at 216. Thus, summary judgment in defendants' favor on plaintiff's § 1983 claim against defendant Wells is appropriate.

### c. City of Kinston

As to plaintiff's § 1983 claim against defendant Kinston, where "there are no underlying constitutional violations by any individual, there can be no municipal liability." Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999). Accordingly, on the analysis above, summary judgment on plaintiff's claim against defendant Kinston is appropriate and, therefore, granted.

### 2. Other Claims

The court turns to plaintiff's state law claims for negligence, gross negligence, and assault/battery.

The court's jurisdiction over these state law claims is supplemental to its original jurisdiction over the federal claims discussed above. See 28 U.S.C. § 1367(a). However, "a court has discretion to dismiss or keep a case when it 'has dismissed all claims over which it has original jurisdiction.'" Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (quoting 28 U.S.C. § 1367(c)(3)). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Id. For example, the Fourth Circuit has explained that a

"district court, once it ha[s] determined, at the summary judgment stage, that the § 1983 claim should be dismissed, . . . [is] altogether justified in declining to assume pendent jurisdiction over state claims for assault and battery, . . . negligence, . . . and gross negligence." Thompson v. Prince William County, 753 F.2d 363, 365 (4th Cir. 1985).

The court, considering the relevant factors and in exercise of its discretion, declines to assume supplemental jurisdiction over plaintiff's state law claims. Those claims are dismissed without prejudice.

C.      Defendants' Motion in Limine (DE 31)

Where the court finds no call to rely on any evidence stemming from plaintiff's expert Munday and where plaintiff does not rely on any of Munday's evidentiary materials in a manner impactful to the court's above analysis, defendants' motion to exclude consideration of Munday's testimony is moot and, therefore, denied.

D.      Motion for Sanctions (DE 46)

Plaintiff, in his same filing objecting under Rule 56(c)(2) to defendants' statement of facts, moves for sanctions, "including, but not limited to, payment of [p]laintiff's attorneys' fees" incurred responding to defendants' motion for summary judgment. (Pl.'s Objs. & Mot. (DE 46) at 10). Defendants' allegedly sanctionable conduct is violation of this court's protective order of February 16, 2021, by failing to file under seal materials from the SBI's report. (Feb. 16, 2021, Order (DE 22) at 1).

As an initial matter, plaintiff has failed to follow Local Civil Rule 7.1(e) by not filing "an accompanying supporting memorandum" in support of his motion. Moreover, the protective order itself acknowledges that "documents contained within the SBI Report" can be used for "defending this action, including . . . motions for summary judgment." (Feb. 16, 2021, Order (DE 22) at 1). Defense counsel's actions, at worst, reflect a misunderstanding of the scope of the protective order

41

and the actions it requires, and has not been shown to be the product of ill will or otherwise sanctionable behavior. Defendants report that, at the time of their motion, they had not received clarification whether the SBI, the entity with a potential interest in keeping the materials confidential, desired materials on the docket to be sealed, and no motion for their sealing was made. Therefore, plaintiff's motion for sanctions is denied.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 33) is GRANTED. Plaintiff's § 1983 claims are DISMISSED as a matter of law. His state law claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3).

Defendants' motion in limine (DE 31) is DENIED as moot. Plaintiff's Rule 56(c)(2) objections are SUSTAINED in part, OVERRULED in part, and moot in remaining part, as set forth herein. His motion for sanctions (DE 46) is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 31st day of August, 2022.

LOUISE W. FLANAGAN
United States District Judge